Ardia V. McCREE *v.* STATE of Arkansas

78-227                                    585 S.W. 2d 938

Opinion delivered September 10, 1979
(In Banc)

*Christopher C. Mercer, Jr.,* for appellant.

*Steve Clark,* Atty. Gen., by: *E. Alvin Schay,* Asst. Atty.

Gen., for appellee.

DARRELL HICKMAN, Justice. Ardia V. McCree was tried in the Ouachita County Circuit Court for capital felony murder; he was convicted and sentenced to life imprisonment without parole.

On appeal he alleges five errors which we find on review to be without merit.

The evidence against McCree was mostly circumstantial, no witness was produced who saw McCree kill Evelyn Boughton, the victim.

The crime occurred shortly after 8:00 a.m., February 14, 1978, at the La Tienda Gift Shop and Service Station in Camden, Arkansas, which Mrs. Boughton owned. McCree made a statement to the police which was video-taped and shown to the jury. McCree's version of the incident, as realted on the tape, was that he left home early that morning with the intention of talking to his mother-in-law. He was driving his white and maroon colored Lincoln Continental. He had taken his Winchester 30.30 caliber rifle with him and laid it in the back seat of his car. He explained he was having trouble with his wife and felt he needed protection.

He drove up to the La Tienda Service Station and put $2.00 worth of gasoline in the car. While he was there a tall black man wearing an overcoat walked up to him and asked him for a ride. He described the man, who was a stranger to him, as having a bumpy face, with a long scar. He agreed to give the man a ride and went in to pay for the gasoline. As he did, the other man walked in with the rifle and said, "Hold it." Mrs. Boughton reached out, or made a move, and he shot her. The other man got a bank bag off a counter, turned the gun on McCree and said, "Let's go."

They got in the car and the other man drove, holding the rifle on McCree. They left Camden at a high rate of speed, going north on Highway 7. After they left town they turned off Highway 7 onto a dirt road. As they were going down the road they met a log truck going toward Highway 7. Less than

a mile down the dirt road the other man stopped the car in the middle of the road, took the gun and bank bag with him and told McCree to turn around, leave and say nothing. McCree said he last saw the man walking down the road.

McCree said he drove back to Highway 7 and headed north. He passed the same log truck at the intersection with Highway 7, or just after he turned onto Highway 7. After he had traveled a short distance he passed the Camden Chief of Police who was headed in the other direction. The Chief turned around and followed him and at a road block the Chief asked him to get out of the car, searched him and asked for his driver's license. After several questions, McCree was released. McCree indicated he was headed in the other direction. The Chief turned around and followed him and at a road block the Chief asked him to get out of the car, searched him and asked for his driver's license. After several questions, McCree was released. McCree indicated he was going to Hot Springs. McCree said he was scared and confused and did not know what to do when he was stopped. He went to the races in Hot Springs and then decided to go to his brother's house in Little Rock. He was arrested in Hot Springs. He explained that the money he had on him at the time he was arrested, which was over $200.00, was mostly money that he had borrowed from two other people.

C. C. Blackstock, who runs a fish market across the street from the service station, said that he heard a shot that morning and saw a black male come out of the service station with a gun which appeared to be a rifle or a small gauge shotgun. He saw the man get into a car which he described as maroon, or reddish rust, with a white top. After the vehicle left he ran across the street, found Mrs. Boughton shot and called the police department.

The police arrived shortly thereafter, and, after talking to Mr. Blackstock, put out a call on the radio to stop a brown Mercury with a white top.

The Camden Chief of Police testified that he received that radio message and was searching for that vehicle when McCree was stopped north of Camden. Later that morning

the description of the vehicle was changed to a maroon and white Lincoln Continental and, based on that information, the Chief called the Arkansas State Police in Hot Springs and asked that they find and arrest McCree.

Ann Mitchell testified that she was on her way to work that morning and drove past the La Tienda Service Station. As she was approaching the station she noticed a car pulling out at a high rate of speed. She described it as a white over burgundy Continental driven by one black male. She did not think anyone else was in the vehicle.

The log truck driver testified that he was passed on the dirt road in question that morning by a brown or maroon Mercury or Lincoln driven by a black male. He said he watched the vehicle in his rear-view mirror, saw the man drive down the road, stop, get out, get back in, turn around and follow the truck back to Highway 7. He did not see anyone else in the vehicle.

An F.B.I. officer testified that in his opinion the bullet which killed Mrs. Boughton came from McCree's rifle. The daughter of Mrs. Boughton identified the bank bag as belonging to Mrs. Boughton; she identified her mother's signature on several checks.

About two days after this crime the gun and the bank bag were found about twenty steps off the Tate's Bluff Road, which is the dirt road the log truck driver used the morning of the 14th of February. The items were found less than a mile down the road from Highway 7.

The defense called as a witness, James C. Bevill, who had signed a statement for the police. It said that he had passed the service station that morning and saw McCree leaving the station. He saw no gun or object in McCree's hands. He said he saw another man sitting in the passenger side of McCree's vehicle.

Bevill had changed his story by the time of the trial. He had signed another statement shortly before the trial in which he indicated that he had misunderstood the police. He

thought they had asked him if he knew a black man with a scar and he said, "Yes." He told them he knew a man by the name of Joe Brewer who had a scar. Brewer was later brought in and Bevill said that was not the man he saw. He said he never intended to say that he saw anyone with McCree at the station on that date. Bevill admitted that he did sign the first statement with the police. The police officers in question verified that he did make that statement and in their judgment understood what he was saying.

The defense revealed that since his last statement Bevill had been punished by the Camden Municipal Court for DWI. He admitted that he had told McCree's lawyer he was bitter about it because he thought he was a friend of the police.

McCree alleges five errors on appeal.

First, he argues that the jury was improperly qualified. McCree argues that certain jurors were excluded who may have had general objections to the death penalty but would not automatically vote against it.

In *Witherspoon* v. *Illinois*, 391 U.S. 510 (1968), the United States Supreme Court held it was reversible error for a trial court to exclude for cause a venireman who simply had scruples against capital punishment. Justice Stewart, for the majority, stated:

> Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.

The jury in this case was qualified for the death penalty. That is, the State was seeking the death penalty and made an effort to obtain a jury that would consist of those individuals who could in good conscience sentence a person to death if the case warranted it. The State sought to exclude those veniremen who said they would automatically vote against

the death penalty under any circumstances.

As an example of improper exclusions, McCree uses the *voir dire* of Juror Douglas. At first, Douglas, in response to the State's questions, said:

> Prosecuting Attorney: You've heard the question the Court asked you earlier and I'll try to recite it as best I can, and not embellish on it a lot, and get right to the point of it, as to whether or not if you're selected as a juror, you would refuse or, for some reason of your own under any circumstances to impose the penalty of death.. . .Okay. Mr. Douglas?

> Juror Douglas: You said it depend on — on death you say? I couldn't.

> Prosecuting Attorney: You just would not?

> Juror Douglas: No.

> Prosecuting Attorney: Under any circumstances?

> Juror Douglas: Under any circumstances . . . .

The attorney for McCree then questioned Douglas:

> Defense Attorney: Yes, sir Mr. Douglas, are you saying that your mind would be completely closed before you went into the jury box, that you under no circumstances — no matter what the situation — proved, and no matter what the Court instructed you the law was, that you already made up your mind that you could not even consider it? It doesn't say that you — could you consider it, it doesn't say committing yourself to both points in advance. Would you consider it?

> Juror Douglas: Yes, I could consider it at that point. It's just like I said, I couldn't sentence a man to death.

> Defense Attorney: I'm sorry. I can't hear you.

Juror Douglas: I say I could consider it, but as far as me sentencing a man — as far as — whatever you call it — I couldn't do it. It's just against my will.

Defense Attorney: But you could consider it?

Juror Douglas: Yes. I could consider it . . .

Defense Attorney: Your answer to the question as to whether or not you could consider the death penalty, and you say, "Yes, I could consider it." I'm saying that nobody is trying to get you to commit yourself to vote for it or not vote for it. Do I understand that you have strong feelings against it? But my question to you is that in answering it to the extent that you said you could consider it, could you consider the question sufficiently to make up your mind at the point of conclusion where all the facts and evidence, where then the Court had instructed you of the law before you decided which way you would vote?

Juror Douglas: Yes. I could do that.

Defense Attorney: Pass him back.

The court, not being satisfied, asked questions and solicited the following answers from Juror Douglas:

The Court: Now I've got — Mr. Douglas, let me just clear up the point. Just answer this question. Let me see if I understand you. Would you automatically refuse under any circumstances to vote to impose the death penalty?

Juror Douglas: Would I hold it against you?

The Court: Would you automatically refuse under any circumstances to vote to impose the death penalty, to vote for the death penalty?

Juror Douglas: Say would I?

The Court: Yes.

Juror Douglas: No, I wouldn't.

The Court: I'm not sure you — no, you wouldn't what?

Juror Douglas: I don't guess I got your question then.

The Court: I probably got it turned around.

Juror Douglas: Break it a little smaller where I can understand it.

The Court: Would you ever at any time if you were selected to serve on a jury, vote to have any defendant electrocuted?

Juror Douglas: Would I ever?

The Court: Vote to have one put to death?

Juror Douglas: No, I wouldn't.

The Court: You'd never vote to do that?

Juror Douglas: No, I wouldn't.

The Court: Under any circumstances?

Juror Douglas: No.

The Court: All right. I'm going to excuse Mr. Douglas.

We feel the trial judge properly excluded Douglas, and other jurors who made similar answers to similar questions. There is no doubt that the record reflects that when the prospective jurors were asked by the court whether they could impose the death penalty, their unequivocal answer was no; under no circumstances could they do it.

The record reflects that the trial judge was careful, fairly taking no chances of a misunderstanding. We find no

evidence that any juror in this case was improperly qualified as argued by McCree.

McCree next argues that there was insufficient evidence to sustain the finding of guilty in this case. There are three well settled rules which govern our review of the verdict in this case. We consider only evidence that is most favorable to the appellee, which is the State in this case. *Milburn* v. *State,* 262 Ark. 267, 555 S.W.2d 946 (1977). The jury's finding of guilt will be upheld if there is any substantial evidence to support it. *Id.* It is not the function of an appellate court to weigh evidence or judge the credibility of witnesses; that is the function of the jury. *Barnes* v. *State,* 258 Ark. 565, 528 S.W.2d 370 (1975). There is an abundance of evidence that McCree was at the service station at the time in question. In fact, in his statement he admitted he was there; admitted his gun was used to kill Mrs. Boughton. His defense was that he didn't do it, that some unknown person did it. It was the province of the jury to accept or reject that argument and they decided to reject it. Several witnesses testified they saw only one black male.

McCree was charged with capital felony murder in that Mrs. Boughton was killed in the course of and in furtherance of a robbery. It is not necessary in Arkansas, under the present law, to actually prove that a robbery occurred. *Jarrett* v. *State,* 265 Ark. 662, 580 S.W. 2d 460 (1979). Under Arkansas law, Ark. Stat. Ann. §41-2103, robbery includes attempted robbery. In this case the State did not actually prove beyond a reasonable doubt by direct evidence that money was taken from La Tienda Service Station and that McCree took it. However, it was proved that a bank bag, containing several checks, the property of Evelyn Boughton, was taken. The jury could have concluded that McCree shot Mrs. Boughton and took that bank bag. This would satisfy the Arkansas law that a capital felony murder was committed in the course of or in furtherance of a robbery.

The defense was able to thoroughly search the memory and credibility of the witness Bevill who changed his story. It was for the jury to decide whether he was telling the truth on either occasion and the weight to be given to that testimony.

The third assignment of error is that the trial court abused its discretion by refusing to grant McCree's attorney a continuance. Although the State offered no objection to the continuance, the judge denied the motion. A trial judge has a duty to promptly dispose of cases. All we have before us is the motion, an affidavit attached to it, and the ruling of the court. Essentially, the argument is that more time should have been given so that the counsel for McCree could better prepare for the trial and locate other witnesses who would assist McCree in his defense.

This case is not like *Powell* v. *Alabama,* 287 U.S. 45 (1932), on which the appellant relies, where the defendants were arrested on March 25th, indicted and arraigned on March 31st and tried on April 6th. This trial began May 8, 1978, some two and a half months after McCree had been arraigned. McCree stated at his arraignment on February 22, 1978, that he had retained his present counsel. The fact that counsel was from Little Rock and had to travel to Camden is not, alone, sufficient reason to find that the court abused its discretion in denying the continuance. Also, the motion and affidavit did not specifically name any witness, but indicated there were "possible witnesses" that could be located. The general rule regarding continuances is stated in Rule 27.3, Rules of Criminal Procedure.

> The court shall grant a continuance only upon a showing of good cause and only for so long as is necessary, taking into account not only the request or consent of the prosecuting attorney or defense counsel, but also the public interest in prompt disposition of the case.

In order to show that the trial judge was wrong it must be proved that there was a clear abuse of discretion and that the ruling of the court prejudiced the defendant. *Russell & Davis* v. *State,* 262 Ark. 447, 559 S.W.2d 7 (1977). There is no record of a hearing on the motion for continuance and, based on the bare motion and affidavit that were filed in this case, we cannot say that the court abused its discretion.

The fourth allegation of error is that the Arkansas system which permits a prosecuting attorney to file an information directly in circuit court is unconstitutional. The

appellant McCree has been unable to demonstrate in this case any prejudice that would require us to dismiss the charges against him. We have held the Arkansas system constitutional for many years. *Penton* v. *State,* 194 Ark. 503, 109 S.W.2d 131 (1937); *Dyas* v. *State,* 260 Ark. 303, 539 S.W.2d 251 (1976). Our Rules of Criminal Procedure require that an arrested person who is not released shall be taken before a judicial officer without unnecessary delay. Rule 8.1, Arkansas Rules of Criminal Procedure. McCree was arraigned eight days after the crime, at which time the charges, penalty and his constitutional rights were explained. McCree announced he had retained counsel. The simple fact that a prosecuting attorney can file an information directly against an individual without a pre-trial hearing, such as a grand jury, is not in our judgment an unconstitutional practice. In this case we find no circumstances or facts that would suggest that we should retreat from our decisions, or that the decisions of the United States Supreme Court require dismissal of the charges. See *Gerstein* v. *Pugh,* 420 U.S. 103 (1975). McCree's attorney makes a strong plea in good faith that the Arkansas system ought to be overturned. We will adhere to our previous decisions.

McCree's last allegation is a little difficult to follow. He argues that the State cannot place on him, as a defendant, the burden of proving that a capital punishment statute is unconstitutional; that the fundamental right to be free from cruel and unusual punishment cannot be burdened by the legislature unless the State shows that the legislation serves a compelling state interest. We have upheld Arkansas' statutes on capital punishment and adhere to that precedent. *Collins* v. *State,* 261 Ark. 195, 548 S.W.2d 106 (1977). Furthermore, a defendant who is sentenced to life without parole lacks standing to challenge the death penalty. *Venable* v. *State,* 260 Ark. 201, 538 S.W.2d 286 (1976). McCree argues that life without parole is cruel and unusual punishment. We rejected that argument in *Dyas* v. *State, supra.*

We have examined the record for all possible legal errors, as is our practice in such cases, and, finding none, affirm the judgment.

Affirmed.