John Edward SWINDLER *v.* STATE of Arkansas

CR 79-116                                    592 S.W. 2d 91

Opinion delivered December 17, 1979
(In Banc)

*Don Langston* and *John Settle,* for appellant.

*Steve Clark,* Atty. Gen., by: *Nelwyn L. Davis,* Asst. Atty. Gen., for appellee.

DARRELL HICKMAN, Justice. John Edward Swindler's first trial for killing Randy Basnett, a Fort Smith police officer acting in the line of duty, was held in February, 1977. He was found guilty of capital murder and sentenced to die by electrocution. His trial was held in Fort Smith, Sebastian County. We reversed that conviction because the court failed to grant a change of venue and because the court failed to excuse three jurors. *Swindler* v. *State,* 264 Ark. 107, 569 S.W. 2d 120 (1978). The case was tried again but this time in Scott County, an adjacent county to the judicial district. Swindler was convicted the second time of capital murder and received the same sentence. This is an appeal from that conviction.

The shooting occurred when Swindler stopped off at Fort Smith, Arkansas apparently enroute to Kansas City from South Carolina. He pulled into the Road Runner Service Station just off Interstate 540, which bypasses downtown Fort Smith. It was about 5:00 p.m., Friday afternoon, September 2, 1976.

Basnett, a Fort Smith policeman who was on duty, had stopped to drink a coke with Carl Tinder at the Road Runner Service Station. Tinder ran the service station, which included a small convenience store. Basnett had in the past dropped by from time to time to drink coffee or a coke with Tinder. As they were talking at the counter, inside the station-store, Swindler drove up and parked his vehicle in the middle lane of three lanes under the station canopy. His vehicle was headed east, the driver's side facing the front of the station-store. Swindler went in and asked for directions to Kansas City. Basnett and Tinder told him how to proceed.

Swindler went back outside, raised the hood on his vehicle and was looking after the vehicle when Basnett left the station-store. Basnett got in his police vehicle, which was parked nearby, and drove around to the other side of the station, parking his vehicle to the rear of Swindler's. Apparently Basnett made a radio call and then walked up to Swindler.

Two witnesses testified that Swindler shot and killed Basnett as the officer stood at the car door on the driver's side. Basnett had not pulled his gun until after he was shot. Tinder was one of these eyewitnesses; he was inside the store; the other witness was a man named Steve Cardwell who said he was outside the station.

Basnett was able to fire five or six times through the car door before he died. Basnett fell back, fatally wounded. Swindler, although he was injured, was able to drive off. He was arrested shortly thereafter. The State Police District Headquarters was just across the street from the station.

Four guns and a rifle scope, as well as some ammunition, were found near the vehicle: a .38 Colt revolver, a .38 Smith and Wesson revolver, a 9 shot .22 automatic pistol, all fully loaded, and a .22 caliber rifle containing three live rounds. Over 200 rounds of live ammunition for the rifle were found in or near the vehicle. This evidence was introduced over Swindler's objections.

Swindler's version as to the actual shooting differed. He said he saw the policeman get in his car and thought he was leaving. Swindler went back to seeing after his car and had just gotten into it when he heard a "cock," as a hammer being cocked on a pistol, heard something said to the effect, "damn hippie," and was shot. He said he had a pistol in his belt and another in his pocket and, just as he was laying down the pistol he had taken from his belt, this happened; he turned instinctively and the gun went off. He said he did not know it was a policeman until after he fired. He claimed he was shot first.

He remembered seeing Tinder inside the station-store.

He recalled after the shooting seeing some children about on bicycles. He did not recall seeing the other eyewitness, Cardwell.

The first trial was preceded by news coverage of the killing, of the funeral of the police officer, and of Swindler's past. The coverage was substantial. In some instances the stories contained material that could and, in fact did, result in prejudice to Swindler's right to a fair trial at that time in Sebastian County. The extent of that coverage was discussed at length in our opinion deciding the first appeal. Chief Justice Carleton Harris, in a concurring opinion, especially addressed the problem created by the news coverage of the killing and its relation to Swindler's first trial.

Although the appellant in this case argues some of the same issues regarding a prejudiced community and jury, there is no evidence at all in this record of unfavorable pretrial publicity. The record we have regarding those arguments consists solely of the *voir dire* examination of veniremen (prospective jurors) from Scott County.

We have examined the record not only as to those allegations of error raised on appeal but also other errors as we do in such cases. Rules of Crim. Proc. Rule 36.24. We find no prejudicial error was committed and affirm the judgment and sentence of the trial court.

The first three arguments of error are related and will be discussed together.

## I.

The trial court erred in denying the defendant's motions for a mistrial and motions for a second change of venue when it was shown during *voir dire* of the jury that a fair and impartial jury could not be selected to try this case.

## II.

The trial court erred in overruling the defendant's motions to declare Arkansas' venue statutes (Ark. Stat.

Ann. Sections 43-1507 and 1518) which permits only one change of venue and Article 2, Section 10 of the Arkansas Constitution which permits a change of venue only to another county in the judicial circuit unconstitutional in violation of the fair trial and due process clauses of the United States Constitution and in refusing to change the venue the second time to a county where the defendant can receive a fair and impartial trial.

## III.

The trial court erred in refusing to grant the defendant's motion to excuse jurors for cause (either as a group or singly) and requiring the defendant to exhaust his preemptory challenges to excuse them and to take several jurors who should have been excused for trial.

The United States and Arkansas constitutions entitle a defendant to a fair trial. If, because of pretrial publicity, an impartial jury cannot be seated to try a defendant, his right to a fair trial is violated. *Irvin* v. *Dowd,* 366 U.S. 717 (1961); *Swindler* v. *State, supra; Ruiz & Van Denton* v. *State,* 265 Ark. 875, 582 S.W. 2d 341 (1979).

Swindler's first argument is that, in Scott County, he could not be tried by an impartial jury.

While Swindler's counsel moved six times for a mistrial or change of venue during the 5 days' *voir dire* examination, no evidence at all was offered of pretrial publicity. No affidavits or testimony, showing pretrial publicity or ill feelings in the community as a result of the killing, was offered, as they had been in *Swindler* v. *State, supra* or *Ruiz & Van Denton* v. *State, supra.*

Our law provides affidavits or sworn testimony must be offered to support a motion for a change of venue. Ark. Stat. Ann. § 43-1502.

The only evidence we have of prejudicial pretrial publicity is the *voir dire* testimony of the prospective jurors as 120 jurors were examined. Swindler had not exhausted his

preemptory challenges until after the 11th juror had been selected.

The trial court, no doubt mindful of our decision in the first *Swindler* case, was careful and took pains in selecting this jury.

The fact 120 were examined is not, standing alone, enough to conclude a fair and impartial panel could not be seated.

The judge excluded over 79 people for cause. The jurors seated, while in some instances acknowledging that they knew generally of the crime, Swindler, or the first trial, all said they could set aside what they had heard and try Swindler on the facts and according to the law.

The test of whether pretrial publicity has prejudiced a juror was set forth in *Irvin* v. *Dowd, supra*. It reads:

> It is not required that the jurors be totally ignorant of the facts involved . . . To hold that the mere existence of any preconceived notion as to the guilt or innocence of the accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented at court. 366 U.S. at 722-723.

Deciding to seat a juror challenged for bias is a discretionary matter with the trial judge. To reject a potential juror, the judge must be satisfied that the juror's state of mind is such that he cannot render an impartial judgment and that seating him will result in substantial prejudice to the rights of the defendant. *Jones* v. *State,* 264 Ark. 935, 576 S.W. 2d 198 (1979).

Swindler's attorney did not move to strike 9 of the jurors selected. One was overseas at the time of the killing; another had read or heard nothing of the case, except from her husband; one knew nothing of the facts but only vaguely

recalled "something" about it; another had read, some three weeks before this trial, the local paper in Scott County about the killing; one recalled some news accounts and probably decided Swindler was guilty because he had been found guilty before; one had seen a "little bit" on T.V. and read in the local paper that a Fort Smith policeman was shot. Another had heard nothing and knew nothing. All of these were selected with no objection. The last juror selected, who knew nothing, was selected after the defense had exercised all preemptory challenges.

The three jurors selected, that the defense challenged for cause, were all selected when the defense had remaining a preemptory challenge. These three did admit to having more knowledge than the others.

Thurman Jones had read the Fort Smith newspapers and seen the "case on T.V." He also read that Swindler was accused of killing two others in South Carolina. He had assumed Swindler was guilty since he had been convicted. Jones was questioned extensively. He acknowledged he could set aside all his ideas and information and give Swindler a fair trial.

Milton Staggs had read and heard some about the case and had formed a "little bit" of an opinion. He said he would have no difficulty in setting aside any information or opinion he had formed.

Henry Sunderman had read and heard of the case. He declared he had no opinion about the case. Since a jury had convicted Swindler before, he had to conclude Swindler might well be guilty. But he said he could do his duty in this case and disregard any information he had about the case.

The judge, in his discretion, decided these jurors could serve. We cannot say the judge clearly abused his discretion in selecting these jurors.

There is no comparison at all between this case and the first *Swindler* case and the *Ruiz & Van Denton* case. The appellant cites as controlling the cases of *Irvin* v. *Dowd*,

*supra,* and *Sheppard* v. *Maxwell,* 384 U.S. 333 (1966), the case involving Dr. Sam Sheppard. In both *Irvin* and *Sheppard* there was strong evidence of pretrial publicity that prevented the selection of a fair jury. As we indicated there was no such evidence offered in this case. The only real argument the appellant has is that over 80% of those questioned were excused for cause.

We have independently examined the *voir dire,* as we are required to do in such cases. We find that the facts in Swindler's second trial regarding the composition of the jury are not unlike those that were found to exist in the case of *Murphy* v. *Florida,* 421 U.S. 794 (1975). In the *Murphy* case the Court also found that a considerable number of jurors knew of Murphy's crimes and his past crimes. However, the Court did not find that such information alone required a reversal of Murphy's conviction. The Court compared the difference between Murphy's case and that of *Irvin* v. *Dowd, supra.* The Court stated:

> The *voir dire* in this case [Murphy's] indicates no such hostility to petitioner by the jurors who served in his trial as to suggest a partiality that could not be laid aside. . . .

Applying the tests we have recited, we must conclude that the appellant has not demonstrated such prejudice in the community nor bias on the part of any juror that would require a new trial.

The second argument is meritless. The Arkansas law permitting only one change of venue, and that to a county within the judicial circuit, is not on its face unconstitutional. The case of *Irvin* v. *Dowd, supra,* does not support appellant's argument. The Court in *Irvin* ordered a trial in another county, contra to state law, because the trial judge refused a change of venue simply because state law forbade it.[1] Also, the record in the *Irvin* case, like that in *Swindler* and *Ruiz &*

---

[1] The Court noted in *Irvin* that the state supreme court had held that the Indiana statute could be circumvented if a defendant could not get a fair trial on one change of venue. *Irvin* v. *Dowd, supra,* at 721.

*Van Denton,* was replete with evidence of pretrial publicity and a change of venue was obviously necessary.

It is not necessary for us to decide whether these venue laws can result in a denial of a right to a fair trial and due process of law. The question is, could Swindler receive a fair trial, by an impartial jury, in Scott County? We conclude he could.

The third argument has no merit. The single fact that over 80% of the jurors questioned were excused for cause is not sufficient to find that a mistrial should have been granted or change of venue ordered. That is only one consideration. The judge and lawyers spent 5 days selecting a jury. Except for the three jurors objected to, it can hardly be argued the jury was unacceptable. The fact the defense had to use its preemptory challenges (as did the State) is no reason to find a jury could not be seated.

## IV.

The trial court erred in denying the defendant's motion *in limine* to prohibit the questions of the veniremen on *voir dire* about their feelings concerning the death penalty.

## V.

The trial court erred in excusing for cause any or all of the four veniremen who expressed opposition to the imposition of the death penalty.

These two points were argued as one by the appellant.

The appellant filed a motion *in limine,* which was denied, asking that the State not be allowed to ask prospective jurors whether they opposed the death penalty. Without citing any authority, it is argued that such a procedure denies a defendant a jury composed of a cross-section of the community and, therefore, violates the fair trial and due process requirements of the United States and Arkansas constitutions. This argument does not have any merit as we will

explain in our answer to the fifth assignment of error.

The fifth allegation of error is that four prospective jurors were improperly excused because they expressed opposition to the death penalty. In the case of *Witherspoon* v. *Illinois,* 391 U.S. 510 (1968), the practice of permitting a prosecuting attorney to qualify a jury for the death penalty was not prohibited; what was prohibited by *Witherspoon* is the exclusion of a juror who is not irrevocably opposed to the death penalty.

Of the four prospective jurors excluded by the court on the motion of the State, three of them stated without equivocation that they opposed the death penalty under any circumstances. The other witness did make a statement at one point that he did not believe "he could impose the death penalty." That witness, Murl Carmack, testified as follows:

Q. Let me ask you this. Do you think the death penalty is proper punishment for some crimes?

A. I wouldn't think so.

Q. Do you believe in the death penalty?

A. Not so much.

Q. Do you understand that under the law of Arkansas that it is the jury that finds whether a person is guilty or not guilty, and then if the jury finds the defendant guilty then the jury actually sets the punishment, that is not done by the Judge. Now, if you were on this jury, and you listened to all the evidence, could you, under any circumstances, vote for the death penalty?

A. I wouldn't want to.

Q. I understand you might not want to, but you know it is the law of Arkansas, and if you listened to the evidence and you found that under our law this was a proper case for the death penalty, then could you follow Arkansas law, or would you stick to your own personal feelings?

A. Well, now I would stick to what I believe in.

Q. So are you telling me that no matter what the facts are, or what the law is, that you would not vote for the death penalty?

A. No, I don't think I would.

Q. Okay, now you say you don't think you would. Can you tell me for sure that you would or would not?

A. *Well, I wouldn't then, I will put it that way.* [Emphasis added.]

Q. No matter what the facts were, or what the law was, you would not vote for the death penalty?

A. No, I don't believe I could, and then have a clear conscience.

THE COURT: No, what he has asked you is, and I want to ask you, too, to be sure that I understand. Is that feeling that you have or your belief so fixed and strong that regardless of what the facts might be, regardless of how bad they might be, or how aggravating they might be, in any case, that under no circumstances could you consider imposing the death penalty?

A. *I wouldn't.* [Emphasis added.]

THE COURT: In any case?

A. I don't believe I would.

DEFENSE ATTORNEY: I have no questions, your Honor.

THE COURT: All right, he will be excused for cause.

We are satisfied that this juror was irrevocably opposed to the death penalty and the court was not wrong in excluding

the juror for that reason. See *McCree* v. *State,* 266 Ark. 465, 585 S.W. 2d 938 (1979).

## VI.

The trial court erred in overruling the defendant's motion to reduce the charge on the grounds that the Arkansas death penalty is unconstitutional.

The appellant concedes that we have consistently ruled this point to be without merit, beginning with *Collins* v. *State,* 261 Ark. 195, 548 S.W. 2d 106 (1977), and in every case thereafter where the question has been raised.

## VII.

The trial court erred in denying the defendant's motion to reduce the charge on the grounds that causing the death of a police officer in the line of duty should not constitute the offense of capital murder.

The appellant concedes that we held this argument to be without merit in the first appeal. *Swindler* v. *State, supra.*

## VIII.

The trial court erred in overruling the defendant's motion to reduce the penalty on the grounds that death by electrocution is cruel and unusual punishment.

The appellant concedes that we held this argument to be without merit in the case of *Ruiz & Van Denton* v. *State, supra.*

## IX.

The trial court erred in permitting in evidence any weapons other than the alleged murder weapon over the defendant's objection on relevancy grounds.

The appellant concedes that we held this argument to be without merit in the first appeal. *Swindler* v. *State, supra.*

## X.

The trial court erred in permitting in evidence in rebuttal, testimony and exhibits about highway signs along Interstates 40 and 540 over the defendant's objections on relevancy grounds.

The appellant argues that the State simply called two policemen before the jury to prejudice them by showing that policemen were interested in the case so the defendant would receive the death penalty. The State argues that the testimony of the policemen regarding the signs was used to impeach Swindler's testimony that he was looking for Highway 71 to go to Kansas City. The officers' testimony indicated that there were two exits, before the exit Swindler took to the service station, which were clearly marked "Highway 71 North," thereby impeaching to some degree Swindler's testimony that he was looking for a way to reach Highway 71. We find no merit at all to the appellant's conclusion that the officers were used to prejudice the jury. Certainly we find no prejudicial error resulting from the testimony.

## XI.

The trial court erred in denying the defendant's motions for a directed verdict and to reduce the charge at the close of the state's case and when both sides rested.

Essentially this argument was answered in *Swindler* v. *State, supra*. We view the evidence on appeal most favorable to the appellee. Viewed in that light there was substantial evidence of premeditation and deliberation. The four loaded guns were enough circumstantial evidence for the jury to conclude that he intended to use them; this, together with the two eyewitnesses' testimony is substantial evidence of the elements of the crime of capital felony murder.

## XII.

The trial court erred in denying the defendant's motion for a continuance of the sentencing stage of the trial so that the defendant could present an expert witness who

was prepared to testify that the cruel nature of death by electrocution and possibility of rehabilitation are mitigating circumstances.

Whether a trial court grants or denies a continuance is a matter of discretion and we only set aside a ruling if we find the court abuses that discretion. *Russell & Davis* v. *State,* 262 Ark. 447, 559 S.W. 2d 7 (1977). We find no such abuse in this case. This argument is misplaced because whether death by electrocution is cruel and unusual punishment is a question of law and not of fact; nor is it a circumstance to be considered when a jury deliberates on mitigating circumstances. It is not up to the jury to decide how a defendant dies. Death by electrocution has been decided by the General Assembly as the means of execution in such cases. Ark. Stat. Ann. § 43-2611 (Repl. 1977).

## XIII.

The trial court erred in permitting in evidence over the defendant's objection State Exhibit No. 55 which purported to reflect that the defendant had been convicted of armed robbery and in overruling the defendant's objection to Sentencing Instruction (a) which permitted the jury to find that the defendant committed another felony an element of which was the use or threat of violence to another person or creating a substantial risk of death or serious physical injury to another person.

We ruled this evidence admissible on the first appeal. *Swindler* v. *State, supra.*

## XIV.

The trial court erred in overruling the defendant's objection to Sentencing Instruction (B), which permitted the jury to find that the defendant in the commission of the capital murder, beyond a reasonable doubt, knowingly created a great risk of death to a person other than the victim.

We ruled against the appellant on this same issue in the

first *Swindler* case. However, it is argued that the testimony was substantially different in this case. Swindler's attorney cross-examined in detail the witness Tinder who was inside the service station at the time of the killing. He argues that it was impossible for Swindler to have intended to create a great risk of death to other people. We disagree. The shots were fired in the direction of the station-store front. The evidence is that the officer was struck twice and that Swindler fired twice, but that does not mean that Swindler had any regard for other people in the vicinity. According to the evidence there were at least three people other than the officer in the vicinity; Tinder, Cardwell and Mrs. Cardwell. Swindler could not even swear that he only shot twice; he could not swear that he knew he shot a policeman until after it was done. Tinder was standing behind the counter inside the store front that was virtually all glass. The fact that there may have been a few gasoline pumps or stanchions between Swindler and the store front begs the question. The question is, was there sufficient evidence to support a finding that Swindler knowingly created a great risk of death to other people. There was ample evidence Swindler had no regard for the lives of others in the vicinity. Such evidence was in Tinder's testimony, Cardwell's testimony, all those loaded guns, and even Swindler's own testimony.

## XV.

The trial court erred in permitting in evidence over the defendant's objections State's Exhibits Nos. 56 and 57 which were a computer printout message, complaint and warrant for defendant's arrest for unlawful flight to avoid prosecution and in overruling the defendant's objection to Sentencing Instruction (D) which permitted the jury to find as an aggravating circumstance that the capital murder was committed for the purpose of avoiding a lawful arrest or effecting an escape from custody.

We ruled against the appellant's argument on this issue in the first appeal. *Swindler* v. *State, supra.*

## XVI.

The death verdict was returned on the basis of passion

and prejudice by the jury and when this court compares death penalty cases, the death verdict should be set aside and the defendant be sentenced to life without parole.

We find no evidence that the jury's verdict was based on passion or prejudice. We adhere to the majority opinion in *Collins* v. *State, supra,* which says that we will compare death penalty cases and that we can reduce a sentence if we find it was the result of passion and prejudice. We have reduced one death sentence to life without parole. *Giles* v. *State,* 261 Ark. 413, 549 S.W. 2d 479 (1977). Comparing this killing to others that we have considered, there is hardly any room for argument that the appellant has any grounds for asking for leniency.

In conclusion, Swindler received a fair trial. Therefore, the judgment and sentence in this case are affirmed.

Affirmed.

HARRIS, C.J., not participating.