Harold HOBBS *v.* STATE of Arkansas

CR 80-227                                          617 S.W. 2d 347

Supreme Court of Arkansas
Opinion delivered June 15, 1981

*E. Alvin Schay*, State Appellate Defender, by: *Jackson Jones*, Deputy Appellate Defender, for appellate.

*Steve Clark*, Atty. Gen., by: *C. R. McNair, III*, Asst. Atty. Gen., for appellee.

DARRELL HICKMAN, Justice. Harold Hobbs was charged with capital murder in Jackson County, Arkansas, and on

his counsel's motion the trial was moved to Lawrence County. The State's case was that Hobbs went to an office in Newport, Arkansas, forced a female bookkeeper to write two checks payable to him, took the bookkeeper to a remote location and killed her. Hobbs testified that he was at the scene of the crime but contended that another person killed the victim and forced Hobbs at gunpoint to participate in the robbery and kidnapping. The jury found Hobbs guilty and sentenced him to die.

We must reverse the conviction because of the trial judge's comments during the selection of the jurors. In a capital case the process of selecting jurors is often laborious because the State and the defendant both seek an advantage. The State wants jurors who can vote for the death penalty; the defendant seeks those reluctant to invoke death. The case of *Witherspoon* v. *Illinois*, 391 U.S. 510 (1968) is the controlling precedent in this regard. A person irrevocably opposed to the death penalty cannot sit as a juror. The judge is supposed to direct the process, being given great discretion to insure that no undue advantage is gained. Sometimes the attorneys tend to take over the voir dire process and confuse the jurors. See *Haynes* v. *State*, 270 Ark. 685, 606 S.W. 2d 563 (1980). Sometimes, especially in a death case, the judge has to step in, after the attorneys have questioned prospective jurors, to insure fairness. In the case of *McCree* v. *State*, 266 Ark. 465, 585 S.W. 2d 938 (1979), for example, we approved the actions of a judge who clarified answers regarding the death sentence after both counsel had questioned a prospective juror. Even so, the judge cannot, in effect, step from the bench and aid either party and he cannot unfairly limit either party's right to seek twelve people who can render a fair and impartial verdict.

In this case the trial judge invaded the process, dominating the selection of the jurors to the extent that he restricted the rights of the defense to fully and fairly question the prospective jurors, commented on the evidence, and in general injected himself into the process of selecting the panel so that it could not fairly try and sentence this defendant. The process began with each prospective juror being questioned separately. After two of these individuals

were questioned the court took over the initial questioning of the remaining prospective jurors. The judge questioned the prospective jurors concerning possible bias, whether they could convict on circumstantial evidence, and whether they could fairly impose the death penalty. Then the State was given the witness and finally the defense was given a chance to ask its questions.

While some generalizations can be made, only extensive quotations from the record can accurately reflect the atmosphere of the voir dire. In two instances the judge asked prospective jurors how they would feel if someone came into their home and killed and brutally mutilated their family. This was an effort to determine whether the prospective juror really opposed capital punishment. It was an unfair question with no place in a proceeding to qualify a juror. As one man so aptly remarked to such a statement, that sort of act would seem to cry out for vengeance rather than punishment. Jurors should be sought who can put aside any feelings of vengeance or hate. The test of *Witherspoon* v. *Illinois, supra*, should be met without such questions.

At least eight times the trial judge referred to the notorious Illinois trial of John Wayne Gacy. He used the Gacy case not only as an example of a case where a conviction was obtained with only circumstantial evidence but also as a case where the death penalty should be invoked. Evidently that case had just recently been in the news. He referred to Gacy as a man who killed "thirty or forty young boys." To bring to the mind of a prospective juror that case just before he is about to sit in judgment in a capital case was wrong. The trial judge repeatedly told the prospective jurors that the State only had a case of circumstantial evidence. To suggest that Gacy was convicted on circumstantial evidence was too strong a suggestion concerning the weight to be given to such evidence.

Quite often the trial judge began the questioning by asking the prospective juror his "feelings on capital punishment." Most honest and fairminded jurors have mixed feelings on that subject, or at least they should have to qualify for jury duty. It is only those jurors irrevocably

committed to voting for or against the death penalty who should not sit. There is no doubt that some of the questions by the court confused prospective jurors. Meeting the test of *Witherspoon* v. *Illinois, supra,* should be kept simple. The test is whether one can fairly consider one of two alternative punishments.

In our judgment the judge rehabilitated three prospective jurors that should have been excused for cause or at least examined more fairly.

The court committed error in commenting on the evidence in violation of Ark. Const. art. 7, § 23. An example of that is the examination of prospective juror Virginia Dullinger. The court said:

THE COURT:

Tell me what your answer would be to this. A few months ago there were news stories about a contractor named Gacy in Chicago who killed about twenty or thirty young boys. There was not a single eye witness. The state of Illinois built its case entirely on circumstantial evidence that Gacy was guilty. They also determined that the offense was horrible enough that he should be sentenced to death. Now had you been on that jury and had the proof been strong enough could you have found him guilty even though nobody saw him kill a single one of those twenty or thirty boys?

MS. DULLINGER:

Yes.

THE COURT:

All right. And if the facts were strong enough, could you on circumstantial evidence have sentenced him to death?

MS. DULLINGER:

Yes.

The judge several times rehabilitated a witness that should have been excused for cause or at least more fairly examined. In that regard we quote some of the testimony of prospective juror Roscoe Marshall:

DEFENSE ATTORNEY:

You don't believe, do you, that because somebody is proven guilty of murder that they ought to automatically be put to death because they took a life, do you? Some people feel that way and that's why I want to know if you do?

MR. MARSHALL:

Yeah, I think I feel that way.

DEFENSE ATTORNEY:

You do? If the state proved a death, then the punishment for a death ought to be a death, sort of an eye for an eye?

MR. MARSHALL:

Yes, sir.

DEFENSE ATTORNEY:

We would submit him for cause.

THE COURT:

I remember asking you that if you were on a jury and the jury first were able to agree unanimously that the defendant was guilty and then the court instructed you that once you found him guilty you had two choices as to punishment, life in the penitentiary without parole and death, and as I understood you, you said you would

consider them both depending on how stout the proof was and how horrible the crime was.

MR. MARSHALL:

That's right.

THE COURT:

Then to Mr. McLarty, you said that it just wouldn't make any difference about the circumstances if somebody stopped breathing and they dug a hole and buried them, then somebody else ought to be put to death? Now which do you mean because they're not the same?

MR. MARSHALL:

I would consider both of them, of course, but if I thought he was really guilty of taking a life with no reason, then I would recommend death.

THE COURT:

All right. He's good.

It is our judgment this juror was going to vote for the death penalty and not "consider" any alternative.

In the questioning of prospective juror Patricia Ann Gifford we believe the court rehabilitated her on its own and precluded further inquiry.

THE COURT:

If the circumstantial evidence is strong enough, could you find a person guilty on circumstantial evidence alone?

MS. GIFFORD:

I think so.

THE COURT:

Do you have an opinion or feeling about the death penalty?

MS. GIFFORD:

No.

THE COURT:

If you're taken as one of the twelve to try this case, if the proof was strong enough that you were convinced that the defendant was guilty, and even if there was sufficient proof of aggravating circumstances that you thought the case, that that was strong, if you were told by the court that you had two choices, life in the penitentiary without parole or death by electrocution, if the proof were stout enough, could you vote for death by electrocution?

MS. GIFFORD:

I believe.

DEFENSE ATTORNEY:

You told His Honor that you felt that you could vote for the death penalty. Could you tell me what type of case, in your mind, would deserve the death penalty?

MS. GIFFORD:

*Well, if somebody was proven guilty of murder or something like that, then I think they ought to punish them like that and maybe it will cut down on the crimes that we have at the same time.* [Emphasis added.]

DEFENSE ATTORNEY:

Are you familiar with the saying that comes out of the Old Testament of an eye for an eye, that there's been a death on one hand that the punishment for that would be death on the other? Do you believe in that as far as being just punishment or the proper punishment?

MS. GIFFORD:

Yes, sir. (Rest of answer inaudible.)

DEFENSE ATTORNEY:

If the state in this case proved to your satisfaction beyond a reasonable doubt that Harold Hobbs was guilty of murder, that he was guilty of kidnapping, that he was guilty of robbery, and they proved that the case involved some aggravating circumstances, although His Honor told you that you could consider two punishments if you first found him guilty, life without parole or death by electrocution, do I understand that you're saying that on those facts for this type of case you believe the only proper punishment to be death?

MS. GIFFORD:

If that's what the judge said do.

DEFENSE ATTORNEY:

Well, the judge will give you a choice. In the event you find him guilty, the judge will give you a choice and you can make a choice. All the jury has this vote and, of course, the jury must agree before it becomes a verdict, but you will have a choice of life without parole or death. What I'm trying to determine is whether you are saying if the state proved these things against the defendant then I'm telling you even though I have two choices that my choice is going to be death by electrocution?

MS. GIFFORD:

Yes, I think it ought to be.

DEFENSE ATTORNEY:

You think that's the proper punishment for that type of crime?

MS. GIFFORD:

*I think that would stop some of the crimes that we have in this day and time. That's the only way I think we're going to stop it.* [Emphasis added.]

DEFENSE ATTORNEY:

And though you have two alternatives available to you, you're telling me right now you're not going to consider the one, you're going to just stick to the tougher one because it will stop crime?

MS. GIFFORD:

*Yes.* [Emphasis added.]

DEFENSE ATTORNEY:

We'd submit Ms. Gifford for cause.

THE COURT:

Ms. Gifford, at the risk of your feeling like we're trying to pull you in two opposite directions at the same time, please don't. It's necessary that those questions be asked and that a trial of this sort be conducted with care. And I don't care which your answer is, but I do care whether I'm reading you correctly or not. In your answers to Mr. McLarty, the way he phrased his questions, it sounded like that death is the only punishment that you would consider. Now when I asked you questions before he took over the questioning, I got the impression that what you were telling me was that everything that you voted for or against once you go out in the jury room is

going to depend on the facts that are proven, what's proven from that witness stand, and that next whether you found the defendant guilty or innocent would depend on the facts. That circumstantial evidence would have to meet the measure as far as you're concerned.

MS. GIFFORD:

Yes, sir.

THE COURT:

I'm right on two steps then. And third that when it got down to punishment once the twelve of you had agreed, if you do, that the defendant was guilty, again it would depend on the facts and that if the facts were, I think as I phrased it, strong enough or rough enough you'd vote for the death penalty if you thought that those facts warranted that, but if you thought that the facts didn't justify death, you'd vote for life imprisonment without parole. Am I correct on this third proposition?

MS. GIFFORD:

Yes, sir.

THE COURT:

She's good.

At times it seemed that the judge had predetermined the way a juror would answer. In the case of prospective juror Jess King, who implied that he would have difficulty imposing the death penalty, the court said:

THE COURT:

(Gacy) was tried and they didn't have anybody who said I saw him kill one of those boys, just circum-stantial evidence was all. Now if you had been on that jury up there, could you have found him guilty on

circumstantial evidence, or would you have said since it's circumstantial, I'm just going to have to turn him loose and let him kill some more?

MR. KING:

Yeah, well, I wouldn't have wanted to have told a story.

THE COURT:

No. I don't care what your answer is. I just want to know. You're saying that you couldn't vote for a conviction on circumstantial evidence?

MR. KING:

No.

THE COURT:

You will be excused by the court, Mr. King.

The defense counsel objected at least six times to the court's conduct. After several prospective jurors had been examined, a comprehensive objection was made to the court conducting the voir dire as it had. The court noted that this would be considered a continuing objection. A motion for mistrial was made at the conclusion of the selection on the same basis and it was denied. The record definitely reflects that the court made it clear to counsel not to make objections during the court's voir dire.

DEFENSE ATTORNEY:

... [W]hen you started voir diring the final twelve and you started out on the question of the death penalty and went down, and then you went on circumstantial evidence and you went down on all twelve in their hearing of each other, after or during the time so as to not interrupt the court when you were going on the first one, I asked to approach the bench and you said,

no, you may not, or not at this time, or words to that effect.

THE COURT:

Right.

In one place defense counsel said:

> ... The court has in effect taken all the questions and conducted all the voir dire, and, as I read the law, that's not permissible; that the court is empowered with the authority to limit within reason the questions that are asked, but from the court's questions that were set up and the court's instructions to counsel, counsel is not in a position without, I think violating the court's instructions to pursue any *Witherspoon* type questions to this juror without either disregarding the court's instruction or acting in contempt of it, and I'm not going to act in contempt of it. ... I'm going to be severely limited in my voir dire unless I'm allowed to go into it, so I object.

. . .

BY THE COURT:

Well, is counsel in effect objecting because the Court has suggested that counsel not go back over the same questions that the Court just got through asking? Is that what you're saying?

DEFENSE ATTORNEY:

That's what I'm saying.

BY THE COURT:

You want to go back over it one more time?

DEFENSE ATTORNEY:

No, sir. No, sir, I don't. The point that I'm making is that I would like to have the opportunity to go over it one time, and I would appreciate the opportunity to go over it fresh one time. I don't see how I can stop the Court, and I'm not attempting to stop the Court, but I don't see how I can stop the Court from asking what questions the Court wants to ask first, but enough — I have a difficult enough time to go back and ask the question after the Court has already been gone over it without it being completely repetitious but when the Court points out to the prospective juror that counsel is to listen up and the Court publicly advises counsel and this juror that there shouldn't be any need to go over this again, then I am prejudiced from doing it or at least I'm prejudiced in this lady's eyes.

While the trial judge no doubt felt that he was acting in the best interests of justice when he took over the direction of the voir dire, the record proves that in this case he went too far. For that reason the judgment is reversed.

For clarification we will discuss here those other issues which were raised in this appeal and may arise on a retrial. Hobbs argued that the trial judge was in error in changing the venue from Jackson to Lawrence County because Lawrence County is only composed of .91 percent black people whereas Jackson county is composed of 14.82. He argues that the trial should have been changed to a county with a black population equal to Jackson County. There is no constitutional right to a trial in a county most demographically like that in which the crime occurred. There is no right to a jury composed of a particular race. *Waters* v. *State*, 271 Ark. 33 (1980). There is no contention that the Lawrence County jurors did not represent a cross-section of that county or that the judge ordered the transfer to Lawrence County for an invalid reason. Other counties within the same judicial district had a smaller percentage of blacks. The right is to a jury panel representing a fair cross-section of those in the county where the trial is held. See *Taylor* v. *Louisiana*, 419 U.S. 522 (1975).

The appellant argues that the trial court failed to

suppress the testimony of two witnesses for the State who identified Hobbs by a photograph. The picture was of three black men, two of whom were older than the appellant, who is age twenty-six. The argument is that the photograph was too suggestive. In this case the victim was reported missing to the police about 6:45 p.m. on October 26, 1979. Later that evening two checks were found by the police that had been taken from the business where the victim was a bookkeeper. Her body was discovered at 12:12 a.m. on the 27th. That same morning the police obtained the photograph from the residence of Kathy Davis who lived with Hobbs. The police had no other pictures of Hobbs. When two people called the police on the afternoon of the 27th to say that a man had attempted to draw a check on the business in question, a detective drove immediately to their place of business and these witnesses described the man as a well groomed black male, five feet eight to six feet tall, slender build, in his early twenties. The detective showed the picture to the two witnesses and they identified Hobbs as the man who attempted to cash the check. They testified that they were one hundred percent certain of the identification.

Although the picture may be suggestive, the question is whether there is reliability in the identification. Considering the totality of the circumstances we find the identification evidence was admissible. *Martinez* v. *State*, 269 Ark. 231, 601 S.W. 2d 576 (1980). This court has considered the opportunity of the witnesses to observe; the lapse of time between the attempt to cash the check and the identification; the lack of inconsistencies of the description given by the witnesses; the fact that this was the only available picture; and all matters relating to the identification process. There is no likelihood of misidentification.

After Hobbs had been found guilty and the trial was in the sentencing stage, his counsel sought to introduce some video tapes taken in Texas. These tapes were statements by people who had known Hobbs when he lived there and related to his character when he was in high school. There was no oath administered to the witnesses and there was no opportunity to cross examine given to the State. The trial court refused to allow the tapes and Hobbs argues that this

was error, citing Ark. Stat. Ann. § 41-1301 (4) (Repl. 1977) as authority for his position. That statute provides:

> In determining sentence, evidence may be presented to the jury as to any matters relating to aggravating circumstances enumerated in section 1303 [§ 41-1303], or any mitigating circumstances. Evidence as to any mitigating circumstances may be presented by either the state or the defendant regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters; but the admissibility of evidence relevant to the aggravating circumstances set forth in section 1303 [§ 41-1303] shall be governed by the rules governing the admission of evidence in such trials. The state and the defendant or his counsel shall be permitted to present argument respecting sentencing. [Acts 1975, No. 280. § 1301, p. 500].

This is the first time we have considered this question regarding this statute. While evidence offered in mitigation should not be refused simply because it would not be admissible in a trial, that does not mean that it does not have to have some relevant or probative value regarding mitigation. The statute tends to relax the requirements of *admissibility*. That relaxation would go to perhaps authenticity or in the case of testimony, perhaps hearsay, either of which might prevent admissibility in a trial. That does not mean that the General Assembly intended to totally open the door to any and all matters simply because mitigation is the issue. Testimony that is offered should be sworn and the State should be given an opportunity to cross examine unless there are compelling and valid reasons for not meeting those requirements. Those requirements were not met in this case and we cannot say that there was an abuse of discretion on the part of the trial court in excluding the material.

Hobbs argued for separate jurors on the issue of guilt and punishment. Arkansas's system for a bifurcated trial has been approved by the United States Supreme Court and appellant's issue has no merit. *Gregg* v. *Georgia*, 428 U.S. 153 (1976); *Jurek* v. *Texas*, 428 U.S. 262 (1976); *Collins* v.

*State*, 261 Ark. 195, 548 S.W. 2d 106 (1977), *cert. den.* 434 U.S. 878 (1977).

Hobbs also argues that all of the mitigating circumstances in the statute and in AMCI should have been submitted to the jury. We held in *Miller* v. *State*, 269 Ark. 341, 605 S.W. 2d 430 (1980) that those mitigating circumstances completely unsupported by any evidence need not be submitted to the jury. There was no evidence to support any mitigating circumstances except those submitted which were: (1) The capital murder was committed while Harold Hobbs was acting under unusual pressures or influences or under the domination of another person; (2) Harold Hobbs has no significant history of prior criminal activity; (3) Other: Specify in writing.

The other issues addressed to us need not be answered because they should not arise on a retrial.

Reversed and remanded.

PURTLE, J., concurs.

JOHN I. PURTLE, Justice, concurring. I concur in all of the majority opinion except those portions relating to the photograph identification of the appellant and the rules suggested for receiving evidence in the aggravation and mitigation stage of the trial.

The first point of disagreement with the majority is in allowing the photograph identification of the appellant. The photograph in question is of three men: a young black man wearing a beard and mustache who appears to be in his mid-20's, a mustached middle-aged black man who appears to be in his late 40s or early 50s, and a clean-shaven older man in his 60s who has white hair and a light complexion. Keep in mind the appellant is 26 years of age.

I think the majority could have avoided declaring this photograph as not being too suggestive for the reason that it was shown to a party in an attempt to identify the person who had cashed a check at the bank. The appellant had not

been charged and was not in custody nor were the identifying witnesses victims of a crime. However, the way the matter is written in the opinion it would appear that we would allow such prejudicial and suggestive identification if it were a case of the victim identifying the accused after he was in custody. I do not think the opinion should go that far, even though this error in not prejudicial.

The second point of my disagreement with the majority opinion is the interpretation placed on Ark. Stat. Ann. § 41-1301 (4) (Repl. 1977). The statute clearly states that for the purpose of determining the sentence evidence may be presented to the jury as to *any* matters relating to aggravating circumstances ... or *any* mitigating circumstances. The statute further states that such evidence may be presented by either party *regardless of its admissibility* under rules governing admission of evidence in trials of criminal matters. The statute clearly distinguishes the difference in matters presented in mitigation from those presented in aggravation. The statute states:

> . . . the admissibility of evidence relevant to the aggravating circumstances set forth in section 1303 (§ 41-1303) shall be governed by the rules governing the admission of evidence in such trials. ...

There simply is no regulating criteria relating to mitigation evidence other than it be relevant.

I have been unable to find any history of this statute; therefore, we are left with the interpretation of the plain meaning of the words used in this statute. It seems most logical that the legislature intended to allow the convicted party a last opportunity to plead for his life. After all, only two sentences are possible at this stage of the proceedings. The accused may be sentenced to die by electrocution or may be sentenced to serve life imprisonment without parole in the Department of Correction's institutions. This seems to me to be the reason the legislature specifically stated that an accused could present any mitigating circumstance regardless of its admissibility under the rules of evidence. I think the court is wrong in giving it the interpretation set out in

the majority opinion because the only basis for such interpretation is the personal feeling of the individual members of the court. I realize a convicted person should not be turned loose at this point to present any and everything which might come to his mind. There must be an end to the trial at some time. However, since the person's life is at stake, no doubt the legislature intended to allow him to present testimony, affidavits, statements, pictures, evidence of character and any other matter which has a relation to the offense for which he was convicted. I particularly dislike that portion of the majority opinion which interprets this rule to allow the state an opportunity to cross-examine unless there were compelling and valid reasons for not allowing it. This requirement is simply pulled from the air and is contrary to the intent of the statute.