Lillie Ruth OLIVER *v.* STATE of Arkansas

CA CR 79-119                               594 S.W. 2d 261
Court of Appeals of Arkansas
Opinion delivered February 6, 1980
Released for publication February 27, 1980

580

*John W. Achor,* Public Defender, by: *William H. Patterson, Jr.,* Deputy Public Defender, for appellant.

*Steve Clark,* Atty. Gen.; by: *Victra L. Fewell,* Asst. Atty. Gen., for appellee.

GEORGE HOWARD, JR., Judge. Appellant was found guilty of theft by receiving by the trial judge sitting as a jury. She was sentenced to three years to the Department of Correction.

On January 20, 1979, someone took Russell Settlers' 1975 Ford Econoline Van, which was parked at his business establishment, Sims Barbeque. The keys were in the ignition and the van contained 750 pounds of ribs. Settlers testified that he paid $3,000.00 for the van in August, 1978.

Officer Allen Quattlebaum of the Little Rock Police Department said he observed the van at approximately 2:47 a.m. on January 21, 1979, traveling east on Roosevelt Road and commenced pursuit after recognizing that the van fitted the description of a van reported stolen earlier. The vehicle was traveling between 55 an 60 miles per hour, ran a red light, sideswiped a vehicle, while narrowly missing another head-on and finally collided head-on with a pickup truck. Appellant was occupying the driver's seat and was wedged in between the dash board and the 750 pounds of ribs which had moved forward on impact.

Officer James A. Middleton of the Little Rock Police Department testified that an ambulance was summoned to carry appellant to the University of Arkansas Medical

Center; that he smelled a moderate odor of alcohol on appellant's breath; that she was mobile, but staggered when she walked; and she had sustained facial wounds as a consequence of the accident; that appellant "was pretty intoxicated" and that an attempt was made to take a blood sample, but "because she was too violent", the doctor refused to proceed further.

Martha Harris, a niece of appellant, testified that appellant arrived at her home at approximately 8:00 p.m. on January 20, 1979, and "it was about 1:00 when she left"; that appellant consumed "about two drinks at the most, two or three" and that appellant was not intoxicated when she left her home and was acting as a normal person.

Appellant testified that during the course of the evening, while in the home of her niece, she drank a large quantity of gin, vodka, whiskey and beer; and that she was also taking aspirins and "pain pills" that she had purchased from a drug store, on the advice of a physician, for a "fractured skull"; that she left her niece's home "about one something" and within a few minutes, after she exited the house, she "passed out" and does not remember what happened afterwards until she discovered that she was in the hospital.

The thrust of appellant's argument for reversal is the trial judge denied appellant "A FAIR AND IMPARTIAL TRIBUNAL BEFORE WHICH TO HAVE HER CASE TRIED, GUILT DETERMINED AND SENTENCE PASSED." This contention stems from the trial judge's examination of the appellant, at the close of the State's cross-examination, whereby the trial judge indicated his disbelief in appellant's testimony regarding her alleged intoxicated condition. We deem it appropriate to set out the closing phase of the State's examination and the relevant exchange between the trial judge and appellant:

Q. Okay. So, you had two drinks at her house?

A. Uh huh.

Q. And then you left there at one.

A. Uh huh.

Q. And you only walked a short ways and you don't remember what happened after that?

A. Uh huh.

Q. But you remember taking the bottle with you when you left her house?

A. Right.

Q. What type of bottle was it. Was it a fifth or a half pint or a pint?

A. It was a fifth.

A. What kind was it?

A. It was some Seagram's Seven. The same kind of whiskey I —

Q. That you normally drink?

A. Uh Huh.

Q. And other than that that's all you remember about that night, you woke up in the hospital?

A. That's all.

MR. RODDEY;

Okay. Thank you, Lillie.

THE COURT:

Just a moment. I have some questions. Mrs. Oliver, I want you to tell me again — You understand you're under oath, don't you?

THE WITNESS:

Sir?

You understand you're under oath? You took an oath to tell the truth, the whole truth, nothing but the truth, so help you, God?

THE WITNESS:

Yes, sir.

THE COURT:

You understand what that means, don't you?

THE WITNESS:

Yes, sir.

THE COURT:

Tell me again what you told the Court the first time when you said all that stuff you had to drink. Now, tell me again what you had to drink.

THE WITNESS:

Okay. I left the hospital about two, like I said. I called a cab.

THE COURT:

That was about two in the afternoon?

Uh huh. Okay. First I started off with some gin. Okay. Some gin. Then some I. W. Harper. Some gin. Okay. We had a little wine. Okay. Then we drunk about three six packs. Okay. Time went on and at the time I'm drunk. Well, I was good and high before her boyfriend got there about 6 o'clock and it's dark then. Okay. And, after he got there,

he said 'I'm fixing to go home.' I said, 'Where's Martha Ann?' He said, "Well, she'll be in, I guess, about eight or maybe ten.' Okay. We go out. I was staggering then. I was drunk then. I was falling on the ground. So, we stopped by the liquor store. They got a half pint of Seagram's Seven.

THE COURT:

Which liquor store?

THE WITNESS:

The one on Arch Street Pike.

THE COURT:

Who was with you?

THE WITNESS:

Her boyfriend and another dude.

THE COURT:

Was she with you?

THE WITNESS:

No.

THE COURT:

Okay. Go ahead.

THE WITNESS:

And so, after we got to her house, I poured half of it out of the bottle. I poured me a glassful and poured some coke in it. I drunk that on down. So, that went on a while. So, he went back in the

back room and got a fifth of that Seagram's Seven and some vodka and I was mixing it up.

THE COURT:

Okay. If you had whiskey in the back room, why did you go to the liquor store to buy it?

THE WITNESS:

Well, see, he asked me did I want anything from the liquor store and I said yes.

THE COURT:

Are you getting all this down, Mr. Prosecutor?

MR. RODDEY:

No, sir.

THE COURT:

I want you to issue some office subpoenas for this girl and her boyfriend and that other dude that was there and put them under oath and see if this witness is lying.

All right. Go ahead.

THE WITNESS:

So, after we got to their house, so, you know, we started drinking again. So, we had some vodka. So, I started mixing mine up. I did. So, I just kept like I was going to sleep or passing out and I said 'I'm going to go home.' So, you know, I got up and I grabbed the bottle and I went out the door. And I sit out there. I grabbed my head. I couldn't hardly see at all. So, I started up the street. I said — I kept saying, 'I can't make it, I can't make it.' And I

started drinking again. I just passed out. When I woke up, I was in the hospital.

THE COURT:

What was wrong with you, physically wrong with you to cause you to have to go to the University Med Center that day?

THE WITNESS:

Well, see I was sick all that week. My head kept —

THE COURT:

What was wrong with you?

THE WITNESS:

Well, I couldn't eat anything. This side of my head kept hurting and I couldn't eat. And the doctor told me, said —

THE COURT:

Don't tell me what the doctor told you. What doctor did you see?

THE WITNESS:

Well, I don't know his name.

THE COURT:

All right. Did you check into the emergency room at the University Medical Center?

THE WITNESS:

Uh huh.

THE COURT:

And this is on the day that this alleged theft occurred?

THE WITNESS:

Yeah, same day.

THE COURT:

And that's what?

MR. PHILLIPS:

That's the day before. It would be the 19th.

MR. RODDEY

January 19th.

THE COURT:

Subpoena the emergency room records at the University of Arkansas Medical Center for the 19th and find out if this Defendant was treated in the emergency room and, if so, the doctor's name. Get an office subpoena for him.

All right. Go ahead.

THE WITNESS:

And, so, he told me, said, 'Miss Oliver, you could have a fractured skull.' He said, 'Go home and take two aspirins.' And he said, 'Before you do it,' he said, 'eat as you take that.' But I didn't. I bought me some potato chips but I didn't eat them. I gave them to some more little kids that live next door to me. And, after I went over to their house, they was drinking. I said, 'Y'all give me some.' I said, 'Wait a minute.' I said, 'I want to take this

here first before I do that.' So, I took them two aspirin tablets and the pain pills. So, after I took them two, I just started drinking.

THE COURT:

I've heard enough. You can step down.

MR. PHILLIPS:

Miss Oliver, come on down.

THE COURT:

Anything else, Mr. Phillips?

MR. PHILLIPS:

No, sir, your Honor.

THE COURT:

Any rebuttal, Mr. Prosecutor?

MR. RODDEY:

No, sir.

THE COURT:

Everybody through?

MR. PHILLIPS:

Yes, sir.

THE COURT:

The Court finds Miss Oliver guilty.

Mr. Phillips, you have anything to say before I decide on a sentence?

MR. PHILLIPS:

No, sir, your Honor.

THE COURT:

You have anything to say, Mr. Prosecutor?

MR. RODDEY:

No, sir.

THE COURT:

Any prior involvement with the law?

MR. PHILLIPS:

I don't believe she has any felonies, your Honor.

MR. RODDEY:

No felony convictions.

MR. PHILLIPS:

Your Honor, the Defendant does have four children.

THE COURT:

Well, she wasn't too concerned about them when she was drinking all that whiskey and beer and gin and wine and vodka and all that stuff.

All right, Miss Oliver, you may stand up at the lectern.

THE COURT:

Miss Oliver, the Court finds you guilty and I

think that there is a good likelihood that you may have committed perjury in this Court today but I'm going to reserve judgment on that and let the Prosecutor look into it. But, if he can prove perjury, I'm going to order him to file perjury charges in this case. But I'm not going to punish you for that until I know better. But I do think that you stole this truck and I do think you wrecked it. I do think you knew what you were doing. I don't believe you were drunk. Even your own niece says you weren't.

It is the judgment and sentence of this Court that you be taken by the Sheriff of Pulaski County and delivered to the department of Correction, there to serve at hard labor for a period of three years. It is the further order of this Court that you serve at least one-third of that sentence before you become eligible for parole.

And I guarantee you, Miss Oliver, when they send me a request saying that they're putting you up for parole, if it's anything less than one year, I'm going to object to it seriously and do what I can to keep you in jail.

While a trial judge is not a mere umpire and may interrogate witnesses in an action before him, he may not act in a dual capacity as judge and advocate. The two roles are not concentric. The presentation of a litigant's case in an adversary proceeding should be left to the initiative of counsel who has the responsibility to represent the interest of his client.

It is understandable, from the exchange between the trial judge and appellant, the trial judge could have easily developed a negative opinion regarding the credibility of appellant's testimony, and firmly believed appellant had committed perjury. But court proceedings must not only be fair and impartial, they must also appear to be fair and impartial not only for the benefit of the litigants directly involved, but this is necessary in order to maintain the public's confidence in the judiciary. *Burrows* v. *City of Forrest City,* 260 Ark. 712, 543 S.W. 2d 488 (1976); *Bolden* v. *State,* 262 Ark. 718, 651 S.W. 2d 281 (1978); Canons 2 and 3 of Code of Judicial

Conduct. Furthermore, another difficulty we face is reconciling the trial court's belief that perjury had been committed with the extent and the relative vigorous examination that the judge subjected appellant to in order to confirm his belief, It is plain, a judge ". . . cannot, by virtue of his office, resolve himself into a court of inquiry for the investigation of real or supposed misconduct that may have come to his attention in his courtroom." *Ex parte Burton,* 237 Ark. 441, 373 S.W. 2d 409 (1963). Indeed, it is universally recognized that it is the role of the prosecuting attorney, in the interest of the State, to investigate and bring a supposed offender to the bar of justice to be dealt with within the concept of due process.

We perceive that the better approach, when a trial judge is persuaded that a litigant, in a proceeding before him, has committed perjury is to conclude the proceeding and invite the prosecuting attorney to conduct an investigation to determine if perjury charges are warranted. In this way, not only does the court avoid the appearance of impropriety, but the appearance of subjecting a litigant to a form of intimidation as well.

At the close of appellant's trial, the trial judge made the following observation:

> "And I guarantee you, Miss Oliver, when they send me a request saying that they're putting you up for parole, if it's anything less than one year, I'm going to object to it seriously and do what I can to keep you in jail."

We are not unmindful that a trial judge has a heavy responsibility in the performance of his adjudicative duties and, at times, a judge may inadvertently make observations that might reflect upon his patience. We believe a trial judge should not commit himself to a course of action without having the benefit of all relevant and applicable facts available in order to permit an intelligent and knowledgeable decision which involves the fundamental rights and privileges of a litigant.

It is generally recognized that a parole is not a full release of an offender, and it is not regarded as a form of leniency. The stated purpose of a parole is reformatory; it is a means of restoring to society an offender who is a good risk. This facilitates the offender's reintegration into society by the time his sentence expires. In other words, a parole permits an early release from prison based on a determination that the defendant can live in society without violating the law: *See:* 67A, C.J.S., § 39 Pardon and Parole at page 54.

While the trial judge may have had valid reasons to conclude that appellant was unworthy of any consideration for a parole, at the close of the trial, this is no valid basis for concluding that when appellant becomes eligible for parole, she would not be a good social risk or that she could not live in society without violating the law. This is but a simple application of the adage "Once a sinner is not irrefutable evidence that one is a sinner henceforth and forever."

We are persuaded that appellant has not demonstrated how she has been prejudiced by the action of the trial judge. There is substantial evidence to support appellant's conviction and, accordingly, we affirm. If this were a jury trial, we would have to view the matter in an entirely different light.

Affirmed.