Antonio L. BRITT *v.* STATE of Arkansas

CR 97-200 974 S.W.2d 436

Supreme Court of Arkansas
Opinion delivered July 9, 1998
[Petition for rehearing denied September 10, 1998.*]

* ARNOLD, C.J., and GLAZE and CORBIN, JJ., would grant.

*Bowden Law Firm*, by: *David O. Bowden*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. The appellant, Antonio Britt, was convicted of first-degree murder, two counts of aggravated robbery (merged with the murder convictions), two counts of kidnapping, and attempted first-degree murder. Britt was sentenced to a total of life imprisonment in addition to 110

years' imprisonment to be served consecutively. On appeal, Britt raises numerous issues. We hold that the trial court committed reversible error in denying Britt's motion to suppress certain statements that were taken from him in violation of his right to a first appearance without unnecessary delay under Ark. R. Crim. P. 8.1. We also address other points that are likely to arise again on retrial.

The evidence adduced at trial showed that during the early morning hours of April 9, 1995, the victims, Jonathan Hancock and Bradley Davis, were driving in a white Chevy pick-up truck looking for drugs in Blytheville. They pulled up to a Pontiac Bonneville that was occupied by Britt, Clarence "Ray Ray" Williams,[1] Scotty Hodges, and William Hunt. The victims asked them if they had any drugs, and Scotty Hodges walked to the driver's side of the truck and pulled a gun on Hancock. Britt went to the passenger's side of the truck and forced the passenger (Davis) out of the truck and into the car. Davis testified that the person that came to the passenger side of the truck was "rather skinny, and taller than I am." Davis was six feet four inches and Britt was six feet five inches, the tallest of the four perpetrators. The man that accosted Davis placed a gun to his head and put him in the backseat of the car, and then forced him to get inside the trunk, along with Hancock.

Britt took the truck keys and drove the truck, following the Bonneville to an area adjacent to the river. Hodges accompanied Britt in the truck, while Williams and Hunt were in the Bonneville. While trapped in the trunk, Davis heard a tape continually played that had lyrics to the effect of "snatch 'em, slam 'em in the trunk, f**k 'em, kill 'em, dump 'em, we don't give a f**k." When the car stopped for the final time, Davis heard doors shut and the men arguing over guns. He believed that one of them said that a gun was jammed, and one said a gun was empty. The trunk opened, and Davis was able to see an armed person at the passenger side of the truck. He and Hancock got out of the trunk, and were told to lie down and take off their clothes. The shooting began after they stripped. At one point Davis heard someone say

---

[1] This court affirmed Williams's convictions arising out the same events in *Williams v. State*, 329 Ark. 8, 946 S.W.2d 678 (1997).

"oh s**t, you shot him in the stomach, is he gonna die. I'm outta here." Someone then took off running. After the shooting stopped, Davis simply lay there and heard some voices talking about "that's what y'all white bitches deserve, you got what you came for." After the men left, Davis saw that Hancock had been shot in the forehead. Davis was able to run and get help from a nearby tugboat. Davis had been shot in his neck, his left arm, and his left leg. Hancock died of multiple gun-shot wounds to the head, as well as blunt-force head trauma.

Britt gave four statements to the police, all of which were admitted at trial. The first statement he gave was completely exculpatory, and he denied any involvement or knowledge of a crime. In a second statement he admitted that he had been present at the crime. He said that Hodges told him to get out and drive the white truck after the victims were forced into the trunk. In this version of events Hodges struck one of the victims with his gun, which resulted in the gun discharging into the other victim. Hodges then began shooting both victims. Britt jumped in the truck, and he told Hodges to "come on." Britt and Hodges then went back to Osceola. In a third statement, Britt admitted to possession of a gun (probably a .380) during the incident and that he gave the gun to Hodges after they left the crime scene. In the fourth statement, Britt admitted that he went to the passenger side of the truck to take the passenger to the car. Britt said that he took a wallet from one of the victims. Britt also admitted to possession of a .380 that he fired one time in the air after Hodges started shooting. Britt said that he had lied in his earlier statements "about I didn't shoot no gun but I sh. . . , I shot the gun in the air."

After Davis obtained help in the early morning hours on April 9, 1995, the police were on the lookout for the victims' truck. It was spotted outside of Madison, and then it sped off and was later found abandoned in Madison. A nearby grocery-store employee testified that Britt and Hodges had come by around 5:00 or 5:30 a.m. in a white Chevy pick-up and had bought some gas. Britt was found sleeping at a residence about four blocks from where the truck was found. Immediately after Britt was arrested, the owner of the house found a wallet on the couch where Britt

was sleeping. Davis later identified this wallet as the one that was taken from him.

A number of latent prints lifted from the trunk of the Bonneville and the pick-up truck were positive for Britt. Two guns were located: a Bryco Jennings .380 recovered from the Hodges' home, and a Lorcin .380 recovered from a Freddie Malone, who said that Glen Blount gave him the pistol in the early morning on April 9. Bullet fragments removed from Hancock's head had been fired from the Jennings gun. Various other bullets and bullet casings recovered at the site of the shooting had been either fired or ejected from both the Jennings and the Lorcin guns.

*1. Sufficiency of the evidence.*

█ █ In his third point on appeal, Britt challenges the sufficiency of the evidence to support his convictions. Double jeopardy considerations necessitate that this court consider challenges to the sufficiency of the evidence prior to other alleged trial error. *Burris v. State*, 330 Ark. 66, 954 S.W.2d 209 (1997). We have often stated the test in determining the sufficiency of the evidence — whether there is substantial evidence to support the verdict. *Sanford v. State*, 331 Ark. 334, 962 S.W.2d 335 (1998). Substantial evidence is direct or circumstantial evidence that is forceful enough to compel a conclusion one way or another and which goes beyond mere speculation or conjecture. *Id.* In making this determination, we review the evidence in the light most favorable to the State, and consider evidence both properly and improperly admitted. *Id.*

█ At trial, Britt moved for a directed verdict, arguing that there was no evidence linking him to the crime scene. Britt now emphasizes that the Jennings gun was found at the home of Scotty Hodges, and that the Lorcin was not connected to him either. With regard to the fingerprints on the Bonneville, Britt concedes that he was connected to the car at one point, but not when the victims occupied the car. Britt maintains that there is no proof that he was an accomplice aside from simply being present at the crime scene. This court has explained the required elements of accomplice liability as follows:

> An accomplice is one who, with the purpose of promoting or facilitating the commission of an offense, either solicits, advises, encourages, or coerces another person to commit the offense, aids, agrees to aid, or attempts to aid the other person in planning or committing the offense, or, having a legal duty to prevent the offense, fails to make a proper effort to prevent the commission of the offense. Ark. Code Ann. § 5-2-403 (Repl. 1993). One's status as an accomplice ordinarily is a mixed question of law and fact. *Earl v. State*, 272 Ark. 5, 612 S.W.2d 98 (1981). One's presence at the crime scene or failure to inform law enforcement officers of a crime does not make one an accomplice as a matter of law. *Pilcher v. State*, 303 Ark. 335, 796 S.W.2d 845 (1990) (citing *Spears v. State*, 280 Ark. 577, 660 S.W.2d 913 (1983)).

*Williams v. State*, 329 Ark. 8, 946 S.W.2d 678 (1997). Relevant factors in determining the connection of an accomplice to a crime are the presence of the accused in proximity of a crime, the opportunity to commit the crime, and an association with a person involved in the crime in a manner suggestive of joint participation. *Banks v. State*, 315 Ark. 666, 869 S.W.2d 700 (1994) (citing *Smith v. State*, 310 Ark. 247, 837 S.W.2d 279 (1992)). This court has repeatedly held that to sustain a conviction of a felony murder, it is not necessary that the defendant be shown to have taken an active part in the killing as long as he was an accomplice and had the requisite intent for the underlying felony. *O'Neal v. State*, 321 Ark. 626, 907 S.W.2d 116 (1995) (citing *Dixon v. State*, 319 Ark. 347, 891 S.W.2d 159 (1995)).

In the present case, Britt first denied any involvement in any crime in his first statement to the police on April 9. Britt admitted that he had "rented" the Bonneville from a man known as "Big Bone." In his second statement that day, Britt admitted that he was present with Williams, Hodges, and Hunt as Davis and Hancock were forced out of their truck and placed in the trunk of the Bonneville. He denied that he aided in placing the victims in the trunk. Britt also admitted that he drove the white pick-up to the site where the victims were shot. In this version of events Britt related that Scotty Hodges struck one of the victims in the head with a gun, resulting in the discharge of the gun at the other victim. Hodges then "went to shooting." After this happened, Britt jumped in the pick-up and told Hodges to "come on."

In another statement given at 12:19 p.m. on April 10, Britt admitted that he had possession of a gun from Madison, although he denied that he ever pulled the gun. In a statement given at 3:18 p.m. on April 10, Britt admitted that he went to the passenger door of the truck and escorted the passenger to the car. At the time, he knew that Hodges was attempting to rob the victims. "When I first came to the door I was, I was like wonderin' what [Hodges] was doin', right? He already said he fixin' to go rob 'em but you know I went up there, then, he had the gun to dude head and I opened the door. . . I got him out, put him in the back seat of the car." When asked whether he took anything from the victims as they were forced to undress, Britt said that he "got his wallet from him and threw it in the car." In this version of events, Britt said that he fired his .380 gun "one time in the air" as Hodges began shooting the victims. He admitted that he had previously lied about not shooting a gun but that he had only shot the gun once in the air.

█ Davis testified that the person who approached him on the passenger side of the truck was skinny and taller than he was. According to the testimony, Davis was six feet four inches, while Britt was six feet five inches, the tallest of the four men that participated in the crime. Moreover, Britt had numerous fingerprints and palm prints on the trunk of the Bonneville which contradicted his version that he was not involved in placing the victims inside the trunk and removing them from the trunk. Britt admitted to driving the truck and following the Bonneville to the scene where the victims were shot. After the shootings, Britt yelled to Hodges to join him in the truck, after which they absconded. Britt also admitted to taking Davis's wallet, which was subsequently found on the couch where Britt had been lying immediately before his arrest. Based on the foregoing, we conclude that there was sufficient evidence that Britt assisted in the commission of the crimes for which he was convicted.

2. *The April 10 statements.*

Britt moved to suppress all four of his statements that were eventually admitted at trial. On appeal he brings three separate challenges to their admissibility. He argues that they were not

voluntary, and that they were taken in violation of both Ark. R. Crim. P. 8.1 and 4.1. As to the two April 10 statements, we find merit to Britt's argument that they were taken in violation of Rule 8.1, and that they should have been suppressed.

The evidence reflects that Britt was arrested between 8:30 and 9:00 on the morning of Sunday, April 9. He was taken to the St. Francis County jail. While there, he executed two rights-waiver forms, one which was read to him by Officer Bryan Crites and the other by Officer Mike Marshall. After the execution of these forms, Britt gave a statement that began at approximately 3:45 p.m. and concluded at 4:15 p.m. The second statement on April 9 began at 5 p.m. and concluded at about 6 p.m. The night of April 9 Britt was transported to the Mississippi County detention facility. On Monday, April 10, Britt again executed rights-waiver forms and was interviewed by the police resulting in two taped statements. The record reflects an "Affidavit of Probable Cause" executed by a judicial officer on Tuesday, April 11. The information was filed against Britt on June 19, 1995.

██ ██ On appeal, Britt argues that he was denied a prompt first appearance as required by Ark. R. Crim. P. 8.1:

> An arrested person who is not released by citation or by other lawful manner shall be taken before a judicial officer without unnecessary delay.

The first appearance must be conducted in accordance with Ark. R. Crim. P. 8.3, which provides:

> (a) Upon the first appearance of the defendant the judicial officer shall inform him of the charge. The judicial officer shall also inform the defendant that:
>
> (i) he is not required to say anything, and that anything he says can be used against him;
>
> (ii) he has a right to counsel; and
>
> (iii) he has a right to communicate with his counsel, his family, or his friends, and that reasonable means will be provided for him to do so.
>
> (b) No further steps in the proceedings other than pretrial release inquiry may be taken until the defendant and his counsel have

had an adequate opportunity to confer, unless the defendant has intelligently waived his right to counsel or has refused the assistance of counsel.

(c) The judicial officer, if unable to dispose of the case at the first appearance, shall proceed to decide the question of the pretrial release of the defendant. In so doing, the judicial officer shall first determine by an informal, non-adversary hearing whether there is probable cause for detaining the arrested person pending further proceedings. The standard for determining probable cause at such hearing shall be the same as that which governs arrests with or without a warrant.

This court has specifically refused to define what an "unnecessary delay" is under Rule 8.1. *See Duncan v. State*, 291 Ark. 521, 726 S.W.2d 653 (1987). In *Duncan*, this court held that a three-and-a-half-day delay between arrest and first appearance violated Rule 8.1 where there was no evidence in the record to suggest a reason for the delay, and the State did not offer any explanation in its brief. Rather, the record showed the delay was purposeful and that the prosecutor made a deliberate decision to hold the appellant in detention and ignore the prompt-appearance requirement. The appellant had been interrogated on the day of his arrest for two-and-a-half hours, but did not divulge any inculpatory information. Three-and-a-half days later, without being able to make any phone calls, appellant gave an incriminating statement. Two days after the first incriminating statement, he gave a videotaped confession. Given that the delay violated Rule 8.1, the court was forced to decide whether the remedy for a violation would be automatic exclusion. While the State argued that the statement was otherwise voluntary under the circumstances, the *Duncan* court rejected such an approach, given that voluntariness was not the only concern under Rule 8.1:

> As we have said, assurance of voluntariness is not the only concern. Of equal importance is the mechanism of the first appearance that guarantees that the accused's constitutional rights will be protected and implemented. "Indeed, [the rights afforded under Rule 8.1] are basic and fundamental rights which our state and federal constitutions secure to every arrestee." [citation omitted]. Furthermore, if exclusion under the rule rests on a voluntariness standard, we are again faced with a swearing-match

the rule was designed to avoid. As was stated well in *State v. Benbo*, [570 P.2d 894 (Mont. 1977)]:

> Under [the voluntariness standard] the statutory requirement of an initial appearance without unnecessary delay after an arrest is practically meaningless. Only when a defendant can affirmatively show statements, admissions, or confessions attributed to him were either not made at all, or were involuntarily made, would the failure to provide him with a prompt initial appearance be taken into account. This would put an almost impossible burden on a defendant. Furthermore, there would be no incentive for arresting officers to conform their procedures to statutory requirements.

*Duncan, supra*. That being said, the *Duncan* court adopted a three-part test used in Pennsylvania: 1) the delay must be unnecessary; 2) the evidence must be prejudicial; 3) the evidence must be reasonably related to the delay. The *Duncan* court held that the statement at issue satisfied this test. It was "evident" that the delay was unnecessary and that the incriminating evidence was prejudicial. With respect to whether the incriminating statements were reasonably related to the delay, the court announced that it was sufficient "if it reasonably appears the delay contributed to obtaining the confession." *Id.* When Duncan was first questioned, he gave nothing but exculpatory statements. Moreover, it was only after three-and-a-half days of incommunicado detention before he incriminated himself. Thus, the statements were reasonably related to the delay, requiring their suppression under Rule 8.1.

In *Clay v. State*, 318 Ark. 122, 883 S.W.2d 822 (1994), the investigating officer was asked about the delay in bringing the appellant before a judicial officer. The officer responded that he was asked by the deputy prosecutor to continue to the next court date to gather evidence. Appellant moved to suppress his last two statements due to an unnecessary delay in bringing him before a judicial officer after his arrest. This court agreed in part and reversed. In examining the delay under the three-part *Duncan* test, there was no question that appellant could have been presented on Monday, August 27. The *Clay* court noted a delay to gather evidence as an example of unreasonable delay. The delay was also like the one in *Duncan* because it was deliberate.

The statements at issue were also prejudicial given that appellant admitted to all of the elements of the crime charged, and had not done so in earlier statements. With regard to the reasonable relationship prong the *Clay* court held that the August 26 statement (taken on Sunday before the first possible court appearance) bore no reasonable relationship to the delay, and could be used at retrial. However, with regard to the August 28 statement, the investigating officer's statement that the delay was taken "for evidence involving the case" made it apparent that the expectation was that appellant would admit to the murder. "Short of that, however, we can say with assurance that, if [appellant] had been taken before a judicial officer on August 27, the judicial officer would have followed Ark. R. Crim. P. 8.2 which requires the judge to assure that an accused has counsel appointed if he cannot afford one and does not choose to waive the right to counsel to defend him. Had counsel been appointed, it is most unlikely the statement made on August 28 would have been forthcoming." *Clay*, *supra*. The *Clay* court also reiterated the discussion in *Duncan* that rejected the so-called voluntariness approach.

■ In other contexts, this court has refused to find a violation of Rule 8.1 where the delay has been caused in part by the initiation of contact by the defendant in the interest of negotiating a plea arrangement. *See Landrum v. State*, 326 Ark. 994, 936 S.W.2d 505 (1996) ("*Landrum I*") (delay caused by defendant's desire to give statement); *Johnson v. State*, 307 Ark. 525, 823 S.W.2d 440 (1992) (appellant demonstrated a willingness to talk about crimes which was analogous to situations where this court held that statements during a delay but at the initiation of the arrestee to negotiate a plea bargain were permissible). *Landrum v. State*, 328 Ark. 361, 944 S.W.2d 101 (1997) ("*Landrum II*"), similarly involved a situation where the appellant wanted to give a confession to an unsolved murder, but he wanted to discuss possible punishment first, and specifically asked to postpone the discussion because he was tired. Thus, *Landrum II* was distinguishable from *Clay*, *supra*, given the appellant's desire to confess. We emphasized that the delay was not unnecessary and that the delay bore no reasonable relationship to the statement. The court articulated the following factors in determining the reasonable-

relationship question under *Duncan*: 1) any proof that the delay was for the purpose of obtaining a confession; 2) frequency of police interrogation; 3) whether the accused was incommunicado; and 4) the passage of time. In analyzing these factors, the *Landrum II* court suggested that there was no evidence of police misconduct and adequate *Miranda* warnings were given to appellant.

Applying the three-factored *Duncan* test to the present case, it is clear that Britt was denied a prompt first appearance under Rule 8.1, and that suppression is warranted. First, the delay in bringing Britt before a judicial officer was unnecessary. Britt had been transported to the Mississippi County detention center on the night of April 9, a Sunday. He could have been brought before a judicial officer on Monday, April 10. A deputy prosecutor, Chris Crain, testified that he had actually been in municipal court calling the docket for bail and first appearances on the morning of April 10 before coming to the detention center to listen to portions of Britt's interviews that day. Moreover, the officers as much as admitted that they did not take Britt before an officer on April 10 because they were collecting more evidence. Officer Crites testified that "There was further investigation to be done." Officer Ed Guthrie stated that "I don't know [why he was not taken in on Monday] except maybe for further investigation, further inquiries." Other testimony was to the effect that the officers were simply too tired and unprepared to take Britt before a judicial officer on Monday. Officer Crites testified that "Well, we got back, we had been called out at approximately 2:00 or 3:00 a.m. — early Sunday morning. We were up all day Sunday. We drive to Forrest City. We're up down there. We're still working on this. We drive back. It's late. We're tired. The information wasn't put together to be able to get him arraigned, and then plus other people were involved. More interviews needed to be done. That would be the delay right there that would have caused that." Officer Marshall said that "We'd had a long night and a long day before and we were exhausted. We were tired, and it [the paperwork] simply was not prepared."

The April 10 statements were also prejudicial under *Duncan*. While it is true that in Britt's second statement on April 9 he admitted to being at the crime scene when the victims were

abducted and shot, he gave far more detailed versions of the events, with more inculpatory statements, in the two statements on April 10. Significantly, Britt admitted to possessing a gun in the first statement on April 10, and in the second April 10 statement Britt admitted that he went to the passenger side of the truck to remove the passenger. He also admitted that he actually fired a gun once in the air, and that he had lied about not shooting a gun during prior statements.

▉▉▉ Finally, the April 10 statements are reasonably related to the delay, unlike the April 9 statements taken on Sunday. The relevant inquiry here is whether it reasonably appears that the delay contributed to obtaining the confession. *See Duncan, supra; see also Landrum II, supra* (factors "relevant to this determination" are 1) any proof that the delay was for the purpose of obtaining a confession; 2) the frequency of police interrogation; 3) whether the accused was incommunicado; and 4) the passage of time). Significantly, this is not a case where the defendant initiated contact with the police for the purpose of giving a statement or to negotiate a plea arrangement. *See Landrum I, supra.* Rather, the delay here was deliberate, and the police admitted that the purpose for the delay was in part for "further investigation." Obviously, the delay produced the intended result, more statements from the defendant. *See Clay, supra* (finding reasonable relationship between delay and statement where investigating officer admitted that delay was taken "for evidence involving the case"). Moreover, had Britt been taken before a judicial officer on Monday, April 10, and counsel been appointed, *see* Ark. R. Crim. P. 8.2, it is highly unlikely that the April 10 statements would have been forthcoming. *See Clay, supra.* Based on the foregoing, we hold that the two April 10 statements satisfy the three-pronged *Duncan* test and were taken in violation of Rule 8.1. Accordingly, the trial court clearly erred in denying Britt's motion to suppress the April 10 statements. The judgment of the trial court is reversed, and the case is remanded for further proceedings consistent with this opinion.

The State urges that the statements at issue were otherwise voluntary, so as not to constitute a violation of Rule 8.1. However, this same argument was made and rejected in *Duncan.* As we

said there, "assurance of voluntariness is not the only concern" in interpreting Rule 8.1. *See Duncan*, *supra*. We decline to retreat from that pronouncement in *Duncan* today. The State also suggests that there should be no violation given that police had reasonable cause to arrest Britt, and that the delay in first appearance was not designed to develop reasonable cause. This argument might have more resonance if the only thing at issue here were reasonable suspicion to make a warrantless arrest, and whether Britt received a prompt reasonable-cause determination from a judicial officer. *See* Ark. R. Crim. P. 4.1(e); *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991); *Gerstein v. Pugh*, 420 U.S. 103 (1975). However, we reiterate that the issue here is a first appearance without unnecessary delay under Rule 8.1, not a prompt reasonable-cause determination under Rule 4.1(e). The communications required by Rule 8.3 go beyond a mere probable-cause determination, and "guarantee that the accused's constitutional rights will be protected and implemented." *See Duncan*, *supra*. Finally, the State suggests that suppression is not the appropriate remedy. However, this is contrary to our established law. *Spivey v. State*, 299 Ark. 412, 773 S.W.2d 446 (1989) (remedy for violation of Rule 8.1 is suppression of evidence obtained); *Cook v. State*, 274 Ark. 244, 623 S.W.2d 820 (1981) (same).

### 3. The April 9 statements.

#### a. Voluntariness.

We now take up a number of issues that are likely to occur upon retrial. First is the issue of the April 9 statements and whether they were voluntary. When determining whether a statement is voluntary, the issue on appeal is whether the statement was "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Sanford v. State*, 331 Ark. 334, 962 S.W.2d 335 (1998). In making this determination, we review the totality of the circumstances, and reverse the trial court only if its decision was clearly erroneous. *Id.* Relevant factors are the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of mental or physical punishment. *Id.*

In the present case, the unrefuted testimony from the officers involved was that Britt was informed of and understood his rights. All of the officers testified that no coercive tactics were used, and that Britt did not appear to be under the influence of any intoxicants. While Britt was seventeen years old, and mental examinations placed his intellectual functioning in the borderline or low-average range, this court has held that age and mental capacity are factors that we consider; however, these factors standing alone are not sufficient to suppress a confession. *Humphrey v. State*, 327 Ark. 753, 940 S.W.2d 860 (1997). Britt highlights the fact that the interrogation room, which apparently had a glass wall, was covered with paper. This circumstance alone in no way proves that the police acted in a coercive manner. The trial court did not clearly err in denying the motion to suppress based upon the alleged involuntariness of the April 9 statements.

### b. Ark. R. Crim. P. 4.1(e).

We decline to reach the merits of Britt's argument that his statements should have been suppressed due to a violation of Ark. R. Crim. P. 4.1(e), as it purports to codify the constitutional requirement of a prompt reasonable-cause determination following a warrantless arrest. *See County of Riverside v. McLaughlin*, 500 U.S. 44 (1991); *Gerstein v. Pugh*, 420 U.S. 103 (1975). A review of the record reveals that this argument was never made to the trial court below. Indeed, defense counsel's theory at trial was not that the "48-hour rule" had been violated, but that Britt was not afforded a timely Rule 8.1 first appearance because he was not brought before a judicial officer on Monday, April 10. We will not consider the merits of an argument made for the first time on appeal.

### 4. Judicial Bias.

In Britt's first point on appeal, which is ostensibly labeled in terms of the trial court's bias, Britt raises a number of issues that are better understood in terms of individual assignments of error. To the extent that Britt purports to make an independent cumulative-error argument here, we do not reach the merits due to his failure to make a cumulative-error objection below. *See Echols v.*

*State*, 326 Ark. 917, 936 S.W.2d 509 (1996), *cert. denied*, 117 S. Ct. 1853 (1997); *Witherspoon v. State*, 319 Ark. 313, 891 S.W.2d 371 (1995). However, where Britt has made a judicial-bias argument below, we consider the merits. *See Franklin v. State*, 314 Ark. 329, 863 S.W.2d 268 (1993) ("Absent an objection below the issue of bias may not be raised on appeal.").

### a. *Trial court's questioning during voir dire.*

During voir dire, the trial court questioned the panel members first and then allowed questioning by the parties. The trial court would occasionally interject questions to the panel members during questioning by the defense. During one cited sequence,[2] defense counsel asked a panel member whether she knew about accounts of a crime in Lepanto where a father had shaken his baby to death. The panel member admitted to having strong feelings about the crime, at which point the trial court asked the panel member whether she would rely on media reports or evidence adduced in court. After a number of other questions by the trial court concerning the panel member's exposure to media accounts, defense counsel resumed questioning, and the panel member admitted that she did form an opinion about the crime when she read a media account. The trial court then asked if she had "an opinion right now as to who did this crime?" Defense counsel then moved to strike the panel member for cause, later interposing a "continuing objection" "to the Court's helping me out with instructions [*sic*]. I think that's an unfair comment on certain things, and the Court gave objections [*sic*] that tend to shed light on the way a person should answer, and I think that after the Court interjected on the last point [concerning the panel member] her whole demeanor and defensiveness changes and I think that interferes —." The trial court then interjected that

---

[2] As a separate instance of bias, Britt alludes to a portion of the record where the trial court sustained an objection to the defense question "assuming you find. . . defendant guilty of capital murder. . .would life imprisonment without the possibility of parole be a consideration, or would you feel the only fair punishment was to pay with his life in kind?" Although this question clearly touches on punishment, Britt asserts that in this instance he was forbidden to "inquire of the jury if it would impose lesser-included offenses." At any rate, the point is moot given that the jury did not convict Britt of capital murder.

"Your objection is of record, and I'm going to continue any time I think the question is misleading or a trick bag question — which that's what your questions are right now."

 Arkansas Rule of Criminal Procedure 32.2(b) provides that the trial judge shall put to prospective jurors any question which he thinks is necessary touching on their qualifications to serve as jurors in the cause on trial. The extent and scope of voir dire is left to the sound discretion of the trial judge, and the trial judge's ruling will not be disturbed on appeal, absent an abuse of discretion. *Ferrell v. State*, 325 Ark. 455, 929 S.W.2d 697 (1996). The proper role of a trial judge in voir dire is to direct the process, being given great discretion to insure that no undue advantage is gained. *Anderson v. State*, 278 Ark. 171, 644 S.W.2d 278 (1983). Because attorneys sometimes tend to take over the voir dire process and confuse the jurors, the judge may have to step in, especially in death cases, after the questioning to insure fairness by clarifying answers. *Id*. However, the judge cannot, in effect, step from the bench and aid either party, and the judge cannot unfairly limit either party's right to seek twelve people who can render a fair and impartial verdict. *Id*. For example, in *Hobbs v. State*, 273 Ark. 125, 617 S.W.2d 347 (1981), this court held that the trial court went too far in restricting the right of the defense to fully and fairly question the prospective jurors, commenting on the evidence, and generally injecting himself into the process of selecting the panel so that it could not fairly try and sentence the defendant.

 In the present case, we cannot say that the trial court abused its discretion in the manner in which it questioned panel members. In the instance cited by Britt, it was not clear whether defense counsel was asking the panel member if she had formed an opinion about this case or about the Lepanto incident. In context, the trial court was attempting to ascertain whether the potential juror had prejudged the case and whether she could render a verdict based on the evidence adduced at trial rather than based on media accounts. This certainly does not amount to the court's systematic injection into the selection process as illustrated in *Hobbs, supra*.

### b. Trial court's questioning of witnesses.

Britt's next point concerns the trial court's *sua sponte* questioning of witnesses. The medical examiner testified on cross-examination that he found no evidence of deviant sexual activity in his examination of Hancock's body. Following this cross-examination, and before any further questions by the State on rebuttal, the trial court inquired of the medical examiner whether his testimony concerning injuries on Hancock's penis was consistent with his testimony about the lack of deviant sexual activity.[3] Defense counsel objected that "Antonio I believe is being denied a neutral and detached magistrate. From the beginning of voir dire, the Court has — and it is the Court's right, but I think to a certain degree has in my opinion been prosecuting. It has rehabilitated witnesses. When the State does something and something is left — or you know — when we challenge something or we do anything, the Court is quick to come back and ask a significant amount of questions as should the prosecutor, if they felt there was any —." The trial court responded that "I'm going to ask any question that I think is appropriate to clear up a confused issue. That's my job as judge."

Britt further alleges that the trial court occasionally "rehabilitated" the State's witnesses following a defense objection, without waiting for the State's response to the objection. At one point in Officer Guthrie's testimony, defense counsel objected to him testifying concerning the various heights of the suspects. Before the State responded, the trial court went into a foundational colloquy with Guthrie and overruled the objection. The trial court proceeded in a similar manner following a foundational objection to the introduction of clothes recovered from the trunk of the car. After a chain-of-custody objection and a bench conference concerning the introduction of certain fingerprints, the trial court told the prosecutor to "Ask [the witness] how many of 'em he

---

[3] The medical examiner's testimony was videotaped and later played for the jury. In its brief, the State incorrectly suggests that the trial court offered to remove its colloquy with the witness from the videotape. A review of the record shows that the trial court only offered to remove its later admonition of defense counsel from the videotape, not its examination of the witness.

took and how many of 'em Marshall took and did he observe him taking the others." The prosecutor proceeded to ask some more questions, at which point the trial court asked foundational questions, and then overruled the defense objection.

 ██ Arkansas Rule of Evidence 614(b) generally permits the trial court to interrogate witnesses, whether called by the court or by a party. We have set forth the following as the "clearly established" rule governing the trial court's examination of witnesses by a circuit judge in a jury trial:

> The judge has the right, in a criminal prosecution, to interrogate the witnesses but he has no right to usurp the place of the state's attorney, "and prescribe the order of introduction of the witnesses, and become active in their examination"; nor has he the right to assume the duties resting on the prisoner's counsel in the general conduct of the defense. He may ask questions which the attorneys had the right to propound, and failed to ask, when the answers to the same may tend to prove the guilt or innocence of the accused. It would be a reproach to the laws of the state, if he was required to sit and see the guilty escape, or the innocent suffer through a failure of parties or their attorneys to ask a witness a necessary question. * * * In all trials the judge should preside with impartiality. In jury trials especially, he ought to be cautious and circumspect in his language and conduct before the jury. He should not express or intimate an opinion as to the credibility of a witness, or as to controverted facts. For the jury are the sole judges of fact, and the credibility of witnesses; and the constitution expressly prohibits the judge from charging them as to the facts.

*Jordan v. Guinn & Etheridge*, 253 Ark. 315, 485 S.W.2d 715 (1972) (quoting *Ratton v. Busby*, 230 Ark. 667, 326 S.W.2d 889 (1959)). In a criminal case, the reasons for the restraints upon the judge's examination of witnesses are of greater importance than in civil cases. *See Jordan, supra.* In instances where this court has found impermissible examination of witnesses by a trial court, the judge has typically impugned the credibility of the witness at issue. *See Oliver v. State*, 268 Ark. 579, 594 S.W.2d 261 (Ark. App. 1980); *West v. State*, 255 Ark. 668, 501 S.W.2d 771 (1973); *compare with Hillard v. State*, 321 Ark. 39, 900 S.W.2d 167 (1995) (trial court

permissibly "confirmed" prior testimony by calling additional witnesses in suppression hearing).

██ ██ It goes without saying that a trial judge should refrain from advocacy, especially in a criminal jury trial, and "[t]he presentation of a litigant's case in an adversary proceeding should be left to the initiative of counsel who has the responsibility to represent the interest of his client." *See Oliver v. State, supra.* In this case, the trial court's occasional questioning of witnesses before the State's response to a defense objection may have appeared unduly precipitous. However, it was in the context of evidentiary objections and did not impugn or bolster the credibility of those witnesses. Nor did the trial court's questioning of the medical examiner intimate an opinion as to his credibility. Under these circumstances, we cannot say that the trial court abused its discretion.

### c. Time limitation on voir dire/Strikes for cause.

██ After some voir dire, the trial court announced that it was going to limit each side to thirty minutes of voir dire per three-person panel. However, the trial court also stated that it would not "hold an absolute clock" if the questioning warranted. Britt objected on grounds of denying him effective assistance of counsel, and his right to an impartial jury. We find no abuse of discretion here. Significantly, it does not appear from the record that the trial court mechanically imposed this time limit.

██ Second, Britt objected to being forced to make strikes for cause in the presence of the panel members when the trial court announced that strikes for cause should be made at the moment they arise. While Britt suggests that the court additionally discouraged counsel from approaching the bench, the record reveals that counsel was allowed to approach the bench out of the hearing of the panel to make strikes for cause. Accordingly, the trial court did not abuse its discretion here.

### d. The rap tape.

██ Appellant appears to make an Ark. R. Evid. 403 argument on appeal concerning the rap tape that was found in the

Bonneville and was introduced and played at trial. Davis testified that while he and Hancock were locked in the trunk of the car, a tape was repeatedly played that "sounded something like" "snatch 'em slam 'em in the trunk, f\*\*k 'em, kill 'em, dump 'em, we don't give a f\*\*k." Under Ark. R. Evid. 403, the trial court has discretion to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. We will not reverse the trial court's determination absent an abuse of discretion.

In the present case, given the State's theory of accomplice liability, we cannot say that the trial court abused its discretion in admitting the tape. The evidence was admissible as being corroborative of the intent of Britt and his accomplices in carrying out a plan similar to that suggested by the lyrics on the rap tape.

5. *Jury selection issues.*

Apparently, the venire panel in this case was drawn entirely from the Osceola District of Mississippi County, and did not include people from the Blytheville area, the Chickasawba District. On appeal, Britt argues that the exclusion of people from the Chickasawba District violates his constitutional right to have a jury selected from the entire county, relying on Ark. Const. art. 2, § 10. We have rejected similar arguments in the past. In *Morgan v. State*, 273 Ark. 252, 618 S.W.2d 161 (1981), *overruled on other grounds*, 290 Ark. 130, 717 S.W.2d 784 (1986), appellant argued that the trial court erred in not quashing a jury panel on the grounds that the jury could not properly be drawn only from the Fort Smith District of Sebastian County. We rejected this argument, noting that Ark. Const. art. 13, § 5, divided Sebastian County into two judicial districts. Moreover, Ark. Stat. Ann. § 39-205.1 (Supp. 1979) provided in part that prospective jurors for the following calendar year were to be selected among the current list of registered voters "of the applicable *district or county*." *Morgan, supra* (emphasis in original). "Clearly both our Constitution and the statute contemplate that a jury may properly be drawn from only one district within a county having more than one district. And we so hold." *Morgan, supra.*

In the present case, while there is no constitutional provision dividing Mississippi County into judicial districts as there was for Sebastian County in *Morgan*, there is a legislative provision providing that Mississippi County is a multi-judicial-district county. *See* Act LXXXI of 1901 ("That the County of Mississippi shall be divided into two judicial districts, to be called the Osceola District and the Chickasawba District."); *cf.* Ark. Code Ann. § 16-13-1002 (Repl. 1994) ("The terms of the circuit courts of the counties and districts of the Second Judicial District shall commence at the times and places provided for below and shall run for a period of one (1) year:. . . (C)(i) In the Chickasawba District of Mississippi County: On the first Monday in January. (ii) In the Osceola District of Mississippi County: On the fourth Monday in February.") Accordingly, we affirm as to this point. *See Morgan, supra.*

Britt also moved to quash the jury panel based on lists which indicated that the trial court had excused a number of people on those lists. On "List Four" 92 of 213 names had been stricken with the notation "excused." Fifteen of these people were excused with a notation from the judge, while fourteen were crossed out "for various other reasons." In his motion to quash, Britt also alluded to another list where 77 of 213 names were excused. On appeal, Britt argues that this interferes with his right to "fundamental fairness, due process of law, and a fair trial under the Sixth and Fourteenth Amendments."

In *Ruiz v. State*, 299 Ark. 144, 772 S.W.2d 297 (1989), this court rejected a similar argument that mass excusals by the trial judge constituted an abuse of the trial judge's authority and deprived them of a jury representing a fair cross-section of the community. The *Ruiz* court noted the absence of any suggestion that the discrepancy in the number of venire persons scheduled for jury service, some 403 individuals, and the number actually appearing, around ninety, was the result of any attempt to influence the makeup of the jury panel. "The explained absences, as well as the unexplained, are typical of the problems encountered in summoning large numbers of people to appear for jury service and the conflicts which they perceive as valid reasons not to serve. The record, in other words, presents nothing extraordinary with

respect to the composition of this pool of potential jurors. Thus the ninety or so from which twelve were selected can be assumed to be as fairly representative of a cross-section of the community as four hundred would have been, the only difference being quantitative. That being so, we find nothing compelling in the motion to quash the panel nor requiring deeper scrutiny into the matter. Ark. Code Ann. § 16-31-103 (1985) exempts certain professions and vocations from service on grand or petit juries and empowers the circuit judge to excuse anyone when for *any reason* the interest of such individual or the public will be materially impaired by attendance." *Ruiz*, *supra* (emphasis in original). Moreover, the appellants failed to demonstrate prejudice. Likewise, in the present case, Britt has failed to demonstrate anything "extraordinary" with respect to his pool of potential jurors or that he was prejudiced by the excusals. Accordingly, the trial court did not err in denying his motion to quash the panel.

### 6. *Ark. Sup. Ct. R. -4-3 (h) Compliance*

The record has been reviewed in accordance with Ark. Sup. Ct. R. 4-3(h), and it has been determined that there were no errors with respect to rulings on objections or motions prejudicial to the appellant not discussed above.

Reversed and remanded.

ARNOLD, C.J., GLAZE, and CORBIN, JJ., dissent.

TOM GLAZE, Justice, dissenting. The majority court's decision to reverse this murder conviction will needlessly affect and shorten law officers' future investigations of reported crimes by law enforcement officers. The majority opinion, in my view, cannot be justified.

The court reverses Antonio L. Britt's conviction based on the majority court's assertion that he was not brought before a judicial officer in a timely fashion as required by Ark. R. Crim. P. 8.1, *Duncan v. State*, 291 Ark. 521, 726 S.W.2d 653 (1987), and *Clay v. State*, 318 Ark. 122, 883 S.W.2d 822 (1994). The majority badly misreads and misapplies Rule 8.1 and the two cases that discuss the Rule.

Rule 8.1 provides that an arrested person who is not released by citation or by other lawful order shall be taken before a judicial officer without unnecessary delay. In *Duncan*, we said that, where there is a delay in taking a defendant before a judicial officer after his arrest, any confession gained during the delay will be excluded from evidence if (1) the delay was unnecessary, (2) the evidence is prejudicial, and (3) the evidence is reasonably related to the delay. However, in *Landrum v. State*, 326 Ark. 994, 936 S.W.2d 505 (1996), we made it clear that the purpose in applying the exclusionary rule in cases like *Duncan* is to deter police misconduct.

In *Duncan*, the defendant was marginally retarded, and was kept incommunicado for three-and-one-half days. Duncan was not given a waiver form to sign, nor was it shown that he intentionally relinquished his rights or had a clear understanding of what his rights were. In addition, the prosecutor in *Duncan* took on an investigative role and, in doing so, became a witness as well as the prosecutor in Duncan's case. From the evidence presented, the *Duncan* court concluded that the evidence showed the delay in arranging Duncan's appearance in court was purposeful and that the prosecutor had made a deliberate decision to hold Duncan in detention and ignore the prompt-appearance requirement. In short, because of the State's misconduct and delay, this court suppressed an inculpatory statement Duncan made during the delay.

This court's decision in *Clay* was reversed for the same reason given in *Duncan*. This court in *Clay* said, "The delay in the case now before us was not only unnecessary, it apparently is of the same deliberate sort as we encountered in the *Duncan* case . . . ." The court in *Clay* then pointed to the State's misconduct whereby the deputy prosecutor directed a law-enforcement officer to delay taking Clay before a judicial officer with the expectation that Clay would later admit to capital murder.

There is absolutely nothing in the record before us that even hints that there was any misconduct on any law-enforcement officer's part in this case. But first, the issue of state misconduct aside, the record reveals that Britt obtained a prompt judicial hearing and that no unnecessary delay was evidenced in getting Britt to a hearing.

Britt and three accomplices murdered Jonathan Hancock and shot Bradley Davis shortly before 2:00 a.m. on Sunday, April 9, 1995. He was arrested the same day, and was arraigned the following Tuesday, April 11, 1995. These and other related crimes required the participation and coordination of criminal investigators from two counties, Mississippi and St. Francis.

The initial investigation commenced in Mississippi County at 2:37 a.m. on Sunday, when Hancock's murder was first reported. The investigation then extended into St. Francis County the same day, after authorities learned the truck occupied by Hancock and Davis at the time of the shootings had been seen in Madison. The police's finding the truck led to Britt's and one of his accomplice's arrest around 9:00 a.m. on Sunday. During the afternoon on Sunday, at 3:45 p.m., about seven hours after his arrest, Britt gave authorities an exculpatory statement; however, only an hour and fifteen minutes later, he admitted he had been present with other individuals at the time Hancock was killed. The record reflects that, during this short eight-hour period, Britt had been thoroughly mirandized, had been read his rights, and had voluntarily and intentionally signed and relinquished his rights.

Britt was then returned to Mississippi County for detention at 10:00 p.m. on Sunday night. On the morning of Monday, April 10, the Mississippi County Deputy Prosecutor appeared in municipal court where he learned that suspects in the Hancock murder were in custody at the jail for the crimes of murder, kidnapping, and aggravated robbery. He went to the jail to determine the status of the investigation and learned officers were taking statements from all suspects, including Britt. Blytheville Police Officer Mike Marshall explained that statements were being taken from suspects known to be involved with Britt; but because the officers were still interviewing suspects and had not completed their work, they did not take Britt to court that Monday. Officer Marshall further testified that he was also investigating Britt's connection with another related crime, aggravated robbery. Officers took Britt to court the next day, Tuesday, after they completed their interviews with all the suspects and had completed their paperwork.

From the foregoing, it is easily concluded that once the investigating authorities learned in the wee hours of April 9, 1995,

of Hancock's murder, they collectively and expeditiously worked to locate Britt and others who were involved in the homicide. By about 9:00 a.m., April 9, Britt was arrested, and within eight more hours, Britt had given a statement implicating himself and others. At the end of the day (10:00 p.m.) on April 9, Britt was returned to the Mississippi County jail for detention. However, the investigators' work was not yet completed, since Britt's statement given between 5:00-6:00 p.m. on April 9 named other suspects who still needed to be interviewed.

On the morning of April 10, officers renewed their efforts by conducting interviews of these additional suspects, and reinterviewing Britt. While the officers were required to have (and did have) probable cause to arrest Britt, they were free to follow their investigation wherever it led them. This included additional interviews with Britt so long as any delay in getting him to a magistrate was not part of circumstances employed to overbear his will in order to obtain a confession. *See United States v. Daniels*, 64 F.3d 311 (1995), *cert. denied*, 516 U.S. 1063 (1996). Here, the authorities had probable cause at the time of Britt's arrest and his confession on April 9.

Once again, the record is quite clear that there was no unnecessary delay between the time the officers first questioned Britt about Hancock's murder and the time he confessed, thereby implicating himself and others. Most important, no police misconduct occurred during Britt's incarceration, so there was no policy reason to apply the exclusionary rule to Britt's April 9 inculpatory statement. *See Landrum*, 326 Ark. at 999, 936 S.W.2d at 507. To the contrary, the proof shows that once the state deputy prosecutor learned of Britt's incarceration in the Mississippi County jail, he went to the jail, and was informed about the status of the investigations. Britt was then promptly taken before a magistrate the next day, April 11.

In the circumstances evident in this case, Britt was accorded a prompt appearance before a magistrate and was never made the subject of police misconduct that coerced his confession. I respectfully but strongly disagree with this court's ruling suppressing Britt's confession.

ARNOLD, C.J., and CORBIN, J., join this dissent.