Richard Glenn BELL, Jr. *v.* STATE of Arkansas

CA CR 06-1286 259 S.W.3d 472

Court of Appeals of Arkansas
Opinion delivered June 20, 2007

*Bill E. Bracy Jr.* for appellant.

*Dustin McDaniel*, Att'y Gen., by: *David R. Raupp*, Sr. Ass't Att'y Gen., for appellee.

KAREN R. BAKER, Judge. Appellant Richard Bell, Jr., challenges his conviction for domestic battery in the first degree alleging that the trial court erred by misinterpreting the proof required for the culpable mental state and consequently in failing to grant his motion for directed verdict, and that the verdict is not supported by substantial evidence. We find no error and affirm.

At a bench trial, testimony established that appellant had been living with his girlfriend and her two sons at her residence for approximately seven to eight months. At the time of the incident,

her younger child, who was the victim in this case, was fifteen months old. The older child was three years old. Neither child was appellant's biological child.

The first witness for the State was Detective Steven Caudill with the Blytheville Police Department. He testified that on August 24, 2005, he received a call to proceed to the hospital in Blytheville where he met Officer Justin Moody and observed the injuries to the younger toddler. His testimony initially focused on the introduction of photographs. While a few photographs showed evidence of scarring from previous injuries suffered by the child, the majority of the photographs depicted, as the detective stated, that the "skin had been burned off the feet" of the child. Officer Moody further described how he collected from the bathroom of the home what he believed to be the skin that had been burned from the child's feet. He gathered skin from one foot lying by the wall on the edge of the tub, and the skin from the other foot he retrieved from between the bathtub and the toilet. He also testified that he observed about an inch to an inch and a half of water still in the tub.

The photographs graphically depict the gruesome degloving of the child's feet. The admission of the photographs was not challenged at trial nor is it challenged on appeal. The depiction of the child's injuries evidenced in the photographs obviated the need for more extensive testimony regarding the severity of the injuries or the fact that the seriousness of the injuries was plain to an observer. This photographic evidence exemplifies the reasons underlying the admissibility of photographs to aid the fact finder in reaching its determinations. Our supreme court has explained the assistance that photographs may afford the trier of fact as follows:

> Even the most gruesome photographs may be admissible if they assist the trier of fact in any of the following ways: by shedding light on some issue, by proving a necessary element of the case, by enabling a witness to testify more effectively, by corroborating testimony, or by enabling jurors to better understand the testimony. Other acceptable purposes are to show the condition of the victims' bodies, the probable type or location of the injuries, and the position in which the bodies were discovered.

O'Neal v. State, 356 Ark. 674, 686, 158 S.W.3d 175, 184 (2004) (citations omitted).

In the case before us, the photographs were helpful in explaining Detective Caudill's testimony regarding the child's skin

being burned off and Officer Moody's description of his gathering the separated skin. The evidence further assisted the trial judge in evaluating appellant's recitations of the events leading to the child's injuries and in reaching its determination that the State had met its burden regarding the requisite mental state.

An evaluation of appellant's accounts of the facts and circumstances was particularly necessary because appellant provided different versions of the events surrounding the harm suffered by the child. His first story was conveyed to the court by Detective Bobby Trump with the criminal investigation division of the Blytheville Police Department. This statement was given after a waiver of appellant's Miranda rights with Detective Caudill present. Appellant said that he had started the water and put both children into the tub, then went to the kitchen to fix himself something to eat, and subsequently sat down in the living room to watch television and fell asleep for approximately half an hour. When he awakened, the older child was out of the tub. When he checked on the younger child, appellant noticed that the child's feet were red.

Appellant's second version of the events was taped and was played to the court. In this rendition, appellant described how he smelled the victim's dirty diaper and he did not "really like to smell that in the morning." He prepared the bath water, and specifically stated that he made sure that the bath water was not hot or too cold. He placed both children in the tub with toys. He then dozed off momentarily, and the cries of both children that made him return to the bath. Later in this same story, he stated that he woke up to the victim's screams. He described how one child was screaming and the other was in another room playing with toys. In this second telling, he said that he knew that the water was just warm because when he retrieved the child he pulled the plug to let the water out, he suffered no injuries to his hand in pulling the plug, and felt the temperature of the water to be just warm.

After appellant gave this version of events, Detective Trump confronted appellant about discrepancies in appellant's accounts regarding the incident. In response to Detective Trump's question, "So during the first interview, you were not being truthful at all?" appellant responded, "No sir. I want to be truthful about it. I need to start from the top and tell what happened."

In appellant's next version of events, appellant placed more emphasis on the unpleasantness of the dirty diaper and stated that it was only six to seven minutes before he went to remove the child

from the tub. This account included appellant's statement that the child did not start screaming when appellant placed him into the water. However, appellant did admit that the child was crying before he left the room and by the time appellant had made it to the kitchen, the victim had "really started to scream." Appellant acknowledged that he ignored the child's screams, got something to eat and drink, and walked to the living room. He stated that he finally returned to the bathroom because of the child's incessant screaming. In this version, he recanted his earlier assertions that he had checked the water temperature prior to placing the toddler into the water and claimed that he did not check the water until he returned to the room. He also retracted his original contention that he placed both boys into the tub. He described how he stuck his hand into the water and pulled it right back out because the water was hot. He further said that, despite the child's crying, he waited for an hour before taking the child to the hospital. He described his anger during this wait and stated that he punched a hole in the wall and threw a chair in response to his emotion. He apologized, saying he was sorry for hurting the baby but did not intentionally hurt him.

At trial, appellant testified in his defense. On direct-examination, he explained that prior to the bath that resulted in the injuries to the child, appellant had on other occasions bathed the children with no problems. In this account, he described the child's cries as normal and comparable to when the child just did not want to take a bath. He said that the child did not scream. In this version, he said he dozed off and spontaneously awoke recognizing that he had left the child unattended. He returned to check on the child because he realized he had forgotten the child. He explained that the child liked to be in the bath, but that appellant would always check on him every little while. He asserted that he did not do anything on purpose to hurt the child. He acknowledged that he had seen the photographs and that they were painful to see. He denied that he caused the harm to the child's feet saying that the hot water caused the injuries.

On cross-examination, appellant repeated his statement that the victim was not crying when he went back to the bathroom and asserted that the child did not cry during the wait before leaving for the hospital. Appellant stated that the child's silence scared him because the child wasn't doing or saying anything, just staring.

At the close of the evidence, the trial court found appellant guilty of domestic battery in the first degree and sentenced

appellant to ten years' imprisonment in the Arkansas Department of Correction, with four of those years suspended and credit for time served. On appeal, appellant asserts that the trial court erred by misinterpreting the proof required for the culpable mental state and consequently in failing to grant his motion for directed verdict, and that the verdict is not supported by substantial evidence.

A motion for a directed verdict or dismissal is a challenge to the sufficiency of the evidence. *Green v. State*, 79 Ark. App. 297, 87 S.W.3d 814 (2002). The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Killian v. State*, 60 Ark. App. 127, 959 S.W.2d 432 (1998). Evidence is substantial when it is forceful enough to compel a conclusion and goes beyond mere speculation or conjecture. *Britt v. State*, 334 Ark. 142, 974 S.W.2d 436 (1998).

Appellant sought dismissal below, disputing the State's proof that he acted under circumstances manifesting extreme indifference to the value of human life under Arkansas Code Annotated section 5-26-303(a)(3) (Repl. 2006). That section provides as follows:

> (a) A person commits domestic battering in the first degree if:
>
> . . .
>
> (3) The person causes serious physical injury to a family or household member under circumstances manifesting extreme indifference to the value of human life.

*Id.*

Serious physical injury is defined as "physical injury that creates a substantial risk of death or that causes protracted disfigurement, protracted impairment of health, or loss or protracted impairment of the function of any bodily member or organ." Ark. Code Ann. § 5-1-102(21) (Repl. 2006). Expert medical testimony is not required to prove serious physical injury, as the finder of fact may use its common knowledge to determine whether such injury occurred. *Johnson v. State*, 26 Ark. App. 286, 764 S.W.2d 621 (1989). Similarly, it is not necessary that the impairment be permanent, but merely "protracted." *See Britt v. State*, 83 Ark. App. 117, 118 S.W.3d 140 (2003) (holding that an injury resulted in a "protracted" loss of mobility where the victim was unable to

walk upon arrival at the emergency room, was still unable to walk at the time of her release from the hospital several days later, and required a course of physical therapy to prevent her injuries from resulting in a permanent loss of mobility).

Appellant does not dispute the extent of the child's injury but instead argues that the State failed to prove the culpable mental state required to find that he acted "under circumstances manifesting extreme indifference to the value of human life." A person acts "purposely" with respect to his conduct or a result thereof "when it is his conscious object to engage in conduct of that nature or to cause such a result." Ark. Code Ann. § 5-2-202(1) (Repl. 2006). Intent or state of mind is seldom capable of proof by direct evidence and must usually be inferred from the circumstances of the crime. *Taylor v. State*, 77 Ark. App. 144, 72 S.W.3d 882 (2002). A presumption exists that a person intends the natural and probable consequence of his acts. *Id.* Furthermore, a defendant's improbable explanation of suspicious circumstances may be admissible as proof of guilt. *Alexander v. State*, 78 Ark. App. 56, 77 S.W.3d 544 (2002).

Appellant relies upon *Tigue v. State*, 319 Ark. 147, 889 S.W.2d 760 (1994), to challenge the sufficiency of the evidence regarding his mental state. The *Tigue* case also involved the scalding of a young child. The hands of the five-year-old child in that case were scalded by forcible immersion by the perpetrator. *Tigue* was a first-degree battery case interpreting the phrase "under circumstances manifesting extreme indifference to the value of human life" as used in section 5-13-201, in the context of the first degree battery statute, not in the context of the domestic battery statute at issue here. Interpreting the first degree battery statute, the supreme court held that the phrase "under circumstances manifesting extreme indifference to the value of human life" is "what distinguishes conduct constituting first degree battery from that of second degree battery. Giving the phrase its plain meaning, the circumstances of first degree battery must by necessity be more dire and formidable in terms of affecting human life." *Tigue*, 319 Ark. at 151, 889 S.W.2d at 761-62. Relying on precedent and commentaries to the statutes, the court held that "first degree battery involves actions which create at least some risk of death and which, therefore, evidence a mental state on the part of the accused to engage in some life-threatening activity against the victim." *Tigue*, 319 Ark. at 152, 889 S.W.2d at 762. The supreme court held that while the injuries in that case constituted serious physical injury that they could ascertain no evidence that the child

was injured under circumstances manifesting extreme indifference to human life. Given this lack of evidence, the supreme court modified the conviction to second degree battery.

Neither the State nor appellant discusses the development of the law as it is codified in our domestic battery statute. Neither party suggests that the "value of human life" in the context of the domestic battery statute requires a different interpretation than that articulated by our supreme court in the context of our statute of battery in the first degree. Despite this lack of developed argument, appellant recognizes that distinctions between the two statutes exist and specifically that our domestic battery statutes contemplate a higher degree of accountability for the perpetrator. He argues, "The salutary desire to deal more readily or harshly with family injury must still be consistent with the mens rea culpable mental states or you not only leave gaps in enforcement, but speculation in the quantum of proof leading to injustice." It is unnecessary for us under the facts and arguments of this case to determine what distinction exists in the requisite mental states in the first-degree domestic battery statute and the first-degree battery statute. Appellant's conduct clearly supports the trial court's finding that the child in this case suffered injuries under circumstances manifesting extreme indifference to human life in accordance with the standard appellant claims is applicable.

In support of his contention that the trial court erred in finding that the evidence supported a finding of extreme indifference, appellant cites *McCoy v. State*, 347 Ark. 913, 69 S.W.3d 430 (2002). In *McCoy*, a case involving a charge of murder, our supreme court explained the phrase in question as follows:

> The phrase "under circumstances manifesting extreme indifference to the value of human life" is found in numerous criminal offenses involving injury or death to persons. Regardless of the offense in which it appears, however, this court has consistently viewed that phrase as part of the proof of the actor's mental state. . . . [T]he definition of "purposely" encompasses the culpable mental state of acting knowingly with extreme indifference, which requires deliberate conduct with a knowledge or awareness that one's actions are practically certain to bring about the prohibited result. The combination of knowledge and extreme indifference requires proof that the defendant acted with more than mere knowledge, but less than purposeful intent.

*Id.* at 347 Ark. 913, 922-24, 69 S.W.3d 430,435-37 (2002) (citations omitted) (holding that it was error for the trial court to refuse to instruct the jury on attempted second-degree murder because second-degree murder under section 5-10-103(a)(1) is a lesser-included offense of first-degree murder under section 5-10-102(a)(2), as it differs from the greater offense only to the extent that it requires a lesser kind of culpable mental state).

 Appellant relies upon *Tigue, supra*, to argue that the injuries to the child in this case were accidental and that there was no evidence of restraint to dispute his contention that the injuries were anything other than accidental in nature. Appellant cites no cases to support his contention that evidence of restraint of a child during the infliction of the harm must be presented in order to support a finding that the injury was suffered under circumstances manifesting extreme indifference. We reject the argument that restraint is required. Nevertheless, such restraint is present in this case. Appellant admittedly placed this child in a tub of water so hot that it severed the skin from his feet. It takes no leap in logic for the fact finder to conclude that if this fifteen-month-old child could have crawled away from the bathtub, rather than suffer the pain endured as he suffered this injury, that he would have.

 Equally unavailing are appellant's arguments that he was not knowingly aware that it was practically certain that his conduct would result in the child's injury or that he consciously disregarded a substantial and unjustifiable risk that the child would be injured. Throughout appellant's various renditions of the circumstances culminating in the degloving of this child's feet, he stated that he was familiar with the procedures required to bathe the child in a safe manner and he knew that ensuring that the bath was safe included a conscious effort of checking the temperature of the water. He knew that supervising the child was one requirement for maintaining the child's safety. In one version of the injury, appellant acknowledged that the child was screaming before he left the room, but he ignored the screams choosing to prepare food and drink for himself and returning only because the screams were incessant. In another version, he was frightened by the child's silence, where he described the child as staring and unmoving. His own statements, although inconsistent, support the conclusion that he knew that it was his responsibility to properly supervise the child during a bath and to ensure a safe water

temperature and that he consciously disregarded the risks involved. Even applying the risk of death analysis in first-degree battery cases that appellant claims is required, whether the risk is drowning, the severing of skin, or shock, the risk was indisputably present in this case. On these facts we find the trial court did not err in finding this child's serious physical injuries were inflicted by appellant under circumstances manifesting extreme indifference to the value of human life.

Affirmed.

GLOVER and MILLER, JJ., agree.